**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHAEL ANDREW DARR,

Plaintiff-Appellant,

v.

No. 06-1227

TOWN OF TELLURIDE, COLORADO,

Defendant-Appellee.

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 04-CV-01149-RPM)**

Angela L. Ekker of Barnhart, Ekker & McNally, LLP, Englewood, Colorado, for
Plaintiff-Appellant.

J. Andrew Nathan (Allyson C. Hodges with him on the brief), of Nathan, Bremer, Dumm
& Myers, P.C., Denver, Colorado, for Defendant-Appellee.

Before **MURPHY**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

**HOLLOWAY**, Circuit Judge.

Plaintiff-Appellant Michael Darr filed a lawsuit against Defendant-Appellee Town

of Telluride, Colorado, in the United States District Court for the District of Colorado.

Darr's complaint asserted several claims for relief, including claims under 42 U.S.C. §

1983 that (1) Telluride violated his procedural due process rights when it deprived him of

his property interests in a pre-termination hearing and continued employment; (2) Telluride deprived him of his constitutionally-protected liberty interest by impugning his good name and reputation without providing a name-clearing hearing; and (3) Telluride violated his substantive-due-process rights by arbitrarily and capriciously terminating his employment. Darr's fourth claim under review here sounds in state law: (4) Telluride breached an implied contract with Darr by terminating him without cause and without a pre-termination hearing.

In an oral ruling, the district court granted Telluride's summary-judgment motion. Appx., Vol. II, at 774-778. See Fed. R. Civ. P. 56. Darr now appeals. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

*The Town's Policies*

Telluride hired Michael Darr as a deputy marshal on December 22, 2001, stating that Darr was "appointed and employed in accordance with the Town of Telluride Personnel Policies and Procedures, and the Ethics Code . . . ." Appx., Vol. I, at 286. These policies provided employees with the opportunity for notice and a hearing before having their employment terminated. Appx., Vol. II, at 507-08. But the manual Darr received stated "Undergoing Revision" on its cover and informed its readers that "[t]hese policies and procedures are not intended to serve as an employment contract between the Town and any Town employee." Id. at 455, 469.

On June 19, 2002, Telluride notified its employees that it was changing its existing

policies and provided them with a draft of the proposed policies. The letter accompanying the new policies stated that "[t]he manual is a complete rewrite and revamping of the original policy. . . . Your input is essential. Please take the time to read the draft and forward any comments or questions to Susan no later than Thurs. June 27 9:00 am. (If you prefer, give me a call or stop by the office.)" Appx., Vol. I, at 193. In bold, large font, the letter also notified the town staff of an upcoming meeting about the new policies: "A Board Meeting will be held Monday[,] July 1 to Consider All Comments. Employees Who Wish to Speak with the Board are Invited and Encouraged to Come to Rebekah Hall MONDAY[,] JULY 1 at 10:30 AM. See You There." Id. (emphasis in original). The letter concluded by noting that the final version of the policies would be brought to the Town Council for adoption on July 9. Id.

Telluride did not record minutes of the July 1, 2002, meeting, but town employees submitted affidavits stating that the meeting was held and that a discussion of the draft policies took place. Appx., Vol. II, at 723, 730. There is no evidence that Darr attended the meeting or otherwise made any comments about the new policies. After holding this meeting, Telluride adopted the new policies by resolution on July 23, 2002.

Although Telluride's letter of June 19, 2002, correctly notes that the new policies substantially revised the old policies (e.g., the new policies eliminated the pre-termination hearing requirement imposed by the old policies), the new policies were substantially similar in at least one respect: in bold print, the new policies state that

[t]he policies in this manual are not intended and shall not be

-3-

construed to vest any employee of the Town with any rights arising from any express or implied contract of employment. The Town reserves the right to change or rescind these policies, and to determine the application of these policies to specific circumstances. The Town further reserves the right to alter or eliminate any benefits provided to its employees. Any alteration, elimination, or revision may be made applicable to then-current as well as future employees.
Appx., Vol. I, at 122.

The new policies also state on several occasions that employment with Telluride is terminable at-will. Id. For example, the policies state that "[e]mployment with the Town of Telluride is 'at-will[.]' Any employee may be terminated with or without cause, a statement of reasons, or a hearing, just as any employee may resign at any time, for any reason. Nothing in these policies is intended to modify the Town's at-will employment policies." Id. Telluride also required its employees to sign a statement acknowledging that they understand this language:

I have received a copy of the Town of Telluride Personnel Policies and Procedures Manual and I understand it is my responsibility to read and comply with this document and any subsequent amendments. I further understand that employment with the Town of Telluride is "at-will[.]" Any employee may be terminated with or without cause, a statement of reasons, or a hearing, just as any employee may resign at any time, for any reason. Nothing in these policies is intended to modify the Town's at-will employment policy.
[Signature line].
Appx., Vol. I, at 121.

The policies also made employees aware that they were at-will employees regardless of how Telluride handled their termination: "[e]mployment with the Town is terminable at-will. Any employee may be discharged with or without cause, at the sole discretion of and upon notice from the Town Manager. In most cases, however, dismissal

-4-

will occur upon a written Notice of Dismissal . . . detailing the circumstances prompting the disciplinary action . . . ." Id. at 132. The policies' admonition that "[n]othing in these policies is intended to modify the Town's at-will employment policy," id. at 121, underscores the policies' clear effect: Telluride could terminate employees at whatever time and for whatever reason it saw fit, even though in "most cases" Telluride would notify an employee why he or she was being fired.

Telluride furnished Darr with a copy of the new policies after they were adopted. Darr admitted reviewing the new policies and signing the introduction and acknowledgment form described above. Appx., Vol. I, at 229. Darr also understood that the new policies superseded the old policies, answering "that's a given" when Telluride's counsel asked him a question to this effect. Id. at 106.

*The Citizens Advisory Board*

On January 21, 2003, Telluride adopted a resolution creating the Citizens Advisory Board ("CAB"). Id. at 321. CAB's function was to facilitate communication between Telluride and its citizens and to raise awareness about health and safety issues affecting the community. Id. at 322. CAB was composed of town-appointed community volunteers and did not have policy, legislative, disciplinary, or supervisory power over Telluride's decisions. Id. at 323-24. Conversely, although Telluride drafted and adopted CAB's mission statement, which included objectives such as making recommendations to the Town concerning marshal policies, Telluride did not offer CAB guidance on how to conduct its operations. For example, the town mayor when the CAB was created

testified that CAB lacked operating procedures and that Telluride never instructed CAB about how to conduct its operations.  Id. at 246, 247.

The town mayor described CAB's authority in the negative: "[t]his was not a legislative or public policy board, had no authority.  And . . . it is not a police commission that investigates whether Officer X should or should not have shot so-and-so as he left his apartment carrying an AR 16."  Id. at 248.  Darr's counsel asked the former mayor whether "it [was] part of the discussion [when creating the CAB] that the CAB would be involved in any disciplinary actions of police officers[.]"  He replied: "[i]t certainly would not be."  Id.

*The Events Precipitating Darr's Termination*

On February 25, 2003, CAB met to discuss several topics concerning Telluride's policing methods.  Appx., Vol. I, at 326.  Several citizens complained, and Darr was one of the marshals identified.  Id. at 184.  Darr alleges that CAB's chairman stated that Darr "had left [his] previous employment under 'suspicious circumstances[,]' that [he] had improperly displayed a handgun at a golf course and that [he] had 'poached' or stolen a game of golf."  Appx., Vol. II, at 524.

Telluride received several other complaints about Darr's conduct.  For example, the former mayor testified that restaurant and bar owners complained that Darr intimidated their customers and that he performed bar checks "in a very rough and abusive manner."  Appx., Vol. I, at 238.  Others complained that he "created pandemonium" in another restaurant and that he improperly searched or interrogated a

woman who had just fallen out of a window. Id. Moreover, the town manager testified that he received several complaints about Darr and that "it became obvious that [Darr] had a difficult time communicating and interacting with a good chunk of the public of this community." Id. at 367.

CAB's chairman again made Darr's controversial policing methods a topic of discussion in a local radio broadcast. After being asked about the variety of allegations against Darr, the chairman explained: "[o]verzealous, controlling, uh, a lot of civil rights violations in my opinion, illegal searches and seizures, uh, trying to be an undercover cop, sitting in bars pretending he's a cable guy and trying to get information on the drug activity in town, uh, things of that nature." Appx., Vol. II, at 660 (errors in original).

According to Darr, the airing of these false allegations impugned his reputation, honor, and integrity. On the contrary, Telluride contends that many of these complaints correspond to Darr's hard-nosed policing methods. For example, Telluride asserts that the chief marshal warned Darr that engaging in high-profile, aggressive, and overzealous policing would reduce Darr's effectiveness as a deputy. Aplee. Br. at 10.

Following these several complaints and a well-known private citizen's complaint, which the citizen circulated to Telluride and the media, the chief marshal placed Darr on administrative leave pending the outcome of an investigation. Part of the investigation ultimately revealed that Darr violated a departmental rule requiring marshals to respect others. Appx., Vol. I, at 359. Specifically, "there are grounds to believe that Deputy Darr was overbearing and rude in the execution of the first warning provided to [the citizen

making the complaint]." Id. at 358.

On July 21, 2003, the chief marshal sent Darr a letter terminating Darr's employment with Telluride. Id. at 389. The letter explained that although Darr had "performed admirably on a number of fronts," there were other times when Darr's conduct "resulted in counseling for less than acceptable performance." Id. Specifically, the chief was troubled by Darr's "judgment, tone and demeanor" when handling a search of a suspicious individual and a separate DUI investigation, during which Darr violated a departmental rule. Id. The chief also questioned Darr's judgment on other occasions:

> You have been aware that there has been an undercurrent of hostility developing toward you by certain segments of the community in recent months. This attitude has become particularly prevalent following [certain arrests you participated in]. In spite of this knowledge, you recently chose to socialize in a liquor establishment after completing an early-adjusted shift. Your plainclothes presence in the bar antagonized the owners of the establishment and they requested [that] you leave the premises. . . . I have to question the judgment that was used in your selection of the after-shift "watering hole" on this occasion. Instinctively, knowing what you know, I would like to think that better judgment would have prevailed.
> Id. at 390.

Finally, the crux of the chief's decision seems to have been that Darr's overzealous policing methods had antagonized the community to the point where Darr could no longer effectively perform his job. The chief explained:

> I have stated repeatedly . . . that an aggressive and heavy-handed demeanor will not work in this community. Regrettably, a label has been attached to you in this regard. It is my belief that it is rendering your ability to effectively perform you [sic] role for the Marshal's Department non-existent, with no prospect of improvement. In addition, your actions have adversely affected the public perception

of the Department and I am not optimistic that the situation will change.
Id.

Darr testified that he agreed with this assessment of his inability to effectively perform his duties in Telluride and that the chief marshal accurately described the public's perception: "I believe I participated in that perception, but it wasn't solely mine. . . . Officer Merriman [participated in that perception as well.]" Id. at 109.

As explained above, Darr then filed this federal lawsuit, which the district court dismissed by granting Telluride's motion for summary judgment (thereby also dismissing Darr's state-law claims). This appeal followed.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F.3d at 1326. If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996).

**A. Procedural Due Process**

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972). When a State seeks to terminate a protected property interest, the right to notice and opportunity for a hearing is usually paramount. Id. at 569-70, 570 n.7. Although these demands of due process are often relatively clear, the question of whether an employee has a protected interest in employment is less so. The Supreme Court has stated that property interests are not created by the Constitution, but by existing rules or understandings that stem from independent sources, "such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577.

To create a property interest, the state-law rule or understanding must give the recipient "a legitimate claim of entitlement to [the benefit]." Id. For example, an employee may possess a property interest in public employment if she has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent. See id. at 576-77; Bishop v. Wood, 426 U.S. 341, 344 (1976); Greene v. Barrett, 174 F.3d 1136, 1140-41 (10th Cir. 1999).

**1.   What interest did Darr have in a pre-termination hearing?**

Darr argues that Telluride violated his Fourteenth Amendment procedural due process right by revising its employee manual to eliminate his property interest in a pre-termination hearing without providing adequate notice. Darr says in his opening brief at

-10-

that Telluride did not directly communicate to the employees, including Darr, that they were being stripped of "their rights of due process by the enactment of the new policies." Id. at 35. Darr also asserts that whether an employee "has a property interest in continued employment is a question of fact for the jury." Aplt. Br. at 32.

Darr's attempt to manufacture a disputed issue of fact is unpersuasive. Telluride does not argue that Darr had no right to sufficient notice of the revised policies. Defendant-Appellee's Answer Brief at 13. Telluride appears to concede Darr's right to sufficient notice and says only that Darr received more than sufficient notice of the revised policies. Id. at 13. The unpublished decision in Perrin v. Egger, which Darr relies upon in his briefs, reviewed the same 1990 Telluride policy and held that "[t]he limitation on [the Town Manager's] power of dismissal is that she can make that decision only after providing the employee with the hearing required by . . . the manual. Thus, the plaintiff was entitled to a hearing and to that extent, he had an entitlement deserving some degree of protection, i.e., the opportunity to present his case at a non-public hearing." Aplt. Br. at appx. B, p. 4.

Regardless, Darr's argument—that the jury must decide as a factual question whether an employee has a property interest in a pre-termination hearing—wrongly implies that summary judgment is never appropriate when an employee brings a procedural due process claim.

The facts here are clear and uncontested. We assume, because it is not contested,

and we do not address, whether Darr had a property interest in a pre-termination hearing.[1]

Moreover it is unnecessary to decide this point because we conclude that Darr did not

have a constitutionally protected interest in continued employment.

We now turn to the question whether Telluride's old or new policies created a

constitutionally-protected interest in Darr for continued employment.

### 2. Did Telluride's old or new policies create a constitutionally-protected interest in continued employment?

At-will employees lack a property interest in continued employment. Bishop, 426

U.S. at 345 n.8, 345-347. Under Colorado law, an at-will employee "generally may be

discharged at any time without cause or formal procedure." Johnson v. Jefferson County

Bd. of Health, 662 P.2d 463, 471 (Colo. 1983) (en banc). "[T]he traditional rule with

respect to local government employees has been that: '[L]ocal government employees

hold their posts at the pleasure of the proper local government authorities and can be

dismissed without cause, in the absence of restrictions or limitations provided by law."

Fremont RE-1 Sch. Dist. v. Jacobs, 737 P.2d 816, 820 (Colo. 1987) (en banc).

Darr asserts that the old policies created a constitutionally-protected property

interest in his employment. But Darr cannot point to any provision in the old policies that

---

[1] "The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." *Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983) (footnote omitted). We have noted that "an entitlement to nothing but procedure . . . 'cannot be the basis for a property interest.'" *Robbins v. United States Bureau of Land Management,* 438 F.3d 1074, 1085 (10th Cir. 2006) (quoting *Town of Castle Rock v. Gonzales,* 125 S. Ct. 2796, 2808 (2005)).

-12-

would confer such an interest. His argument that the old policies confer continued-employment rights upon full-time workers is unavailing, since the policies define "full-time" merely as an employee who served a six-month probationary period and who now works forty hours per week. Appx., Vol. II, at 479. There is no evidence in the policies or otherwise that completing this six-month probationary period transformed a Telluride employee from an at-will employee into a tenured employee. Indeed, the old policies expressly disavow the existence of any contractual relationship between the Town and its employees. Id. at 469. Darr has failed to identify any fact or reason why he does not fall within Colorado's traditional rule that local government employees are employed at-will.

Darr's position that the new policies created a property interest in continued employment is similarly unpersuasive. The new policies state in great detail that Town employees are employed at-will and that the policies do not create an employment contract. Appx., Vol. I, at 121, 122, 132. Darr's unreasonable position that he thought "at-will" meant "for cause"—notwithstanding the new policies' clear definition of the term "at-will"—is insufficient to raise a genuine dispute of material fact, making it appropriate to decide as a matter of law whether the new policies created a property interest in continued employment.

We also reject Darr's argument that Telluride's chief marshal created a policy and custom of terminating marshals only for cause. When Telluride fired Darr, the operative policies made clear that Darr was an at-will employee regardless of how Telluride handled his termination: "[e]mployment with the Town is terminable at-will. Any

-13-

employee may be discharged with or without cause, at the sole discretion of and upon notice from the Town Manager. In most cases, however, dismissal will occur upon a written Notice of Dismissal . . . detailing the circumstances prompting the disciplinary action . . . ." Id. at 132. As explained above, the policies' admonition that "[n]othing in these policies is intended to modify the Town's at-will employment policy," id. at 121, underscores the policies' clear effect: Telluride could terminate employees without cause, even though in "most cases" Telluride would notify an employee why he or she was being fired.

To be sure, our precedent supports the proposition that a town's conduct may negate the express disclaimers in its employment manual, thereby creating a disputed fact as to whether the town and its employees' mutual understandings created a property interest. See, e.g., Kingsford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1132 (10th Cir. 2001) (finding such a disputed fact in the procedural due process context). But again, there is no evidence that this occurred here. Although the chief marshal testified that he had never fired anyone without cause—"why would [he] want to . . .," he asked rhetorically in his deposition—the policies unequivocally explain that Darr was an at-will employee regardless of how Telluride handled his termination. The chief marshal followed this part of the handbook exactly as Darr could have expected.

As a matter of policy, Telluride persuasively argues that we should not require it to randomly fire employees to maintain its clearly explained at-will employment policy. Darr's proposed rule—the mere fact that the chief marshal terminated five employees for

cause negates the Town's express policy that employees are employed at-will regardless of how they are terminated—would play havoc with Telluride's relationship with its employees. Telluride would have the perverse incentive to randomly fire its employees without cause in an effort to maintain its at-will employment policy and avoid lawsuits like this one (a dilemma for Telluride because this effort would potentially expose it to even more liability).

Accordingly, we hold that Darr did not have a property interest in continued employment with Telluride.

**3. Did Darr receive adequate notice and opportunity to be heard?**

Since we assume, without deciding, that the old policies created a property interest in a pre-termination hearing, the question presented is two-fold. First, we ask whether the district court improperly resolved a genuine dispute of material fact when it decided that Telluride revised its old policies after providing sufficient notice and opportunity for a hearing. Second, if the district court did not resolve a genuine dispute of material fact, then we must address whether the district court erred by granting Telluride's summary-judgment motion.

Darr explains that the Colorado Supreme Court in Adams County Sch. Dist. No. 50 v. Dickey cited with approval Michigan law that "[a]n employer may, without an express reservation of the right to do so, unilaterally change its written policy from one of discharge for cause to one of termination at will, provided that the employer gives affected employees reasonable notice of the policy change." 791 P.2d 688, 693 (Colo.

-15-

1990).  Both parties look to Durtsche v. American Colloid Co., 958 F.2d 1007 (10th Cir. 1992), for an explanation of "reasonable notice," but fail to recognize that Durtsche only addressed how, under Wyoming contract law, a private employer could effectively modify an employment manual that also constituted a contract with its employees. Indeed, we concluded in Durtsche that although Wyoming contract law allowed an employer to change the terms of its employment manual without acceptance by and additional consideration to its employees, such changes to the manual must be conspicuous. Id. at 1009.

On the issue whether Telluride afforded Darr the process he was due under the Fourteenth Amendment, however, the United States Constitution is our guide.[2] See Kingsford, 247 F.3d at 1128 (stating that "[w]hile a property right can only be created by state law, once a property right is established, the determination of what process is due before that right can be deprived is a question answered by the federal Constitution").

The Supreme Court has stated that "[a]n essential principle of due process is that a deprivation of . . . property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  Specifically, "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314

---

[2]See n. 1, *supra.*

-16-

(1950) (citations omitted). The parties here do not genuinely dispute the following facts: (1) The old policies Darr received conspicuously stated that they were "Undergoing Revision"; (2) Telluride sent out a notice indicating that it planned to hold a hearing about the revised manual before adopting it; (3) Telluride's notice stated that the revised manual completely rewrote and revamped the old policy; (4) Telluride's notice provided the hearing's date, location, and time; (5) Telluride conducted the public hearing regarding the revisions;[3] (6) Darr had the opportunity to attend this meeting to ask questions and make comments about the revised policies; (7) Darr declined to attend the hearing; (8) Darr signed a written acknowledgment that he received, read, and understood the revised policies; and (9) Darr's acknowledgment form stated that the revised policies created an at-will employment relationship and explained that "[a]ny employee may be terminated with or without cause, a statement of reasons, or a hearing." Appx., Vol. I, at 121.

Given these undisputed facts, we find no error in the district court's holding that Telluride amended the old policies after providing Darr with constitutionally adequate notice of and opportunity for a hearing. The only additional step that Telluride could

_____

[3]Darr's disagreement over whether the Town held the meeting does not create a *genuine* dispute of fact. Darr asserts in his opening brief that "it does not appear that a meeting as referred to in the memorandum was held on July 1, 2002, in which employees' comments on the New Policies were considered." Aplt. Br. at 13. This is the only time that Darr mentions this issue in his opening brief, and he fails to provide any evidence to support his assertion. Indeed, Darr's reply brief actually identifies evidence that the meeting occurred, without countering with evidence to the contrary. See Aplt. Reply Br. at 14-15 (reciting Town employees' testimony that the meeting occurred and that "a discussion of the draft policies took place"). Darr's unsupported assertion that the meeting did not occur is insufficient to create a genuine dispute of material fact.

have taken was to explain in its notice precisely how the revised policies rewrote the old policies. But this is what the hearing was for: it defies the purpose of notice to impose the burden on Telluride to explain in its *notice* of a hearing exactly what the *substantive* changes to the policy meant, especially given that Telluride's notice clearly stated that it completely rewrote the old policies and that the new policies would be discussed fully in an upcoming hearing.

It is important to note once again that we are not addressing the question presented in Durtsche—whether the employee was sufficiently apprised of the new policy to make it enforceable as a binding contract. Instead, we are addressing the constitutional question of whether Telluride provided notice and a hearing appropriate for this case. Although Telluride did not employ every theoretically conceivable method to notify Darr, the Constitution does not require more procedure than that provided here.

## B. Liberty Interest: Name-Clearing Hearing

Darr arguably has a liberty interest in his good name and reputation as it related to his employment with Telluride. See Melton v. City of Okla. City, 928 F.2d 920, 927 (10th Cir. 1991) (stating that a public employee has a claim for relief "[w]hen a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities . . . ").

But to state a claim for relief, Darr must show how the government infringed upon

his alleged liberty interest.  We have established a four-prong test for resolving this question: first, the statements must impugn the employee's good name, reputation, honor, or integrity; second, the statements must be false; third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and fourth, the statements must be published.  Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994).  But see Renaud v. Wyoming Dept. of Family Services, 203 F.3d 723, 728 n.1 (10th Cir. 2000) (suggesting that Workman's third element should have been phrased conjunctively: the statement must occur in the course of terminating the employee *and* must foreclose other employment opportunities, contrary to Workman's disjunctive phrasing).[4]

Darr does not assert, nor could he plausibly, that the chief marshal or any other Town representative (with the possible exception of the CAB members) made stigmatizing statements about him.  The chief marshal's only comment to the public about Darr was that he was no longer a Telluride employee, appx., vol. I, at 112-113, a comment which is not sufficient to support Darr's claim because, for one thing, it is not a false statement.  Thus, the threshold question is whether CAB's statements constituted state action redressable under 42 U.S.C. § 1983, as opposed to private conduct by private citizens.  Unless Telluride can be held liable for CAB's conduct, we need not address whether Darr has satisfied the four Workman factors or whether Darr requested a name-

_____

[4]We need not address this issue further because, as we discuss below, Darr's legal theory fails to support his conclusion that Telluride can be held liable for CAB's conduct.

-19-

clearing hearing.

To recover under 42 U.S.C. § 1983, Darr must show that CAB acted "under color" of state law—a test identical to the Fourteenth Amendment's state-action requirement. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 929 (1982) (stating that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical"); United States v. Price, 383 U.S. 787, 794 n.7 (1966) (stating that "[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment"). We have applied this state-action requirement in suits against local governments ever since the Supreme Court plucked these municipalities' shields against § 1983 liability. The reason for doing so stems from § 1983's purpose: "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). Thus, private conduct, no matter how atrocious, cannot ground § 1983 liability against a state entity.

The parties stake out opposite positions on whether Telluride may be liable for CAB's conduct. Telluride outlines several facts tending to show that CAB's conduct may not be attributed to Telluride. In response, Darr identifies evidence allegedly demonstrating that although CAB did not have authority over Telluride, Telluride had authority over CAB—suggesting that CAB's conduct may be attributed to the Town. But

-20-

putting aside the merits of these positions, we need not decide whether CAB acted under color of law because even if Telluride could be held responsible for CAB's conduct, Darr's legal theory does not support his claim for relief.

Specifically, Darr asserts that "[u]nder § 1983, the Town is responsible for actions of its representatives that result in the violation of an individual's constitutional rights when the Town has negligently failed to take steps to prevent or correct the constitutional violation." Aplt. Reply Br. at 25 (citing Rogers v. Board of Trustees, 859 P.2d 284, 287-88 (Colo. App. 1993)). Yet Rogers explicitly rejected this theory: "The Supreme Court has . . . ruled . . . that negligence cannot form the basis of a money damages liability claim under § 1983." Rogers, 859 P.2d at 287 (citation omitted). We too have stated this rule and rejected Darr's position. In Jojola v. Chavez, we stated that "[l]iability under § 1983 must be predicated upon a '*deliberate*' deprivation of constitutional rights by the defendant, and not on negligence." 55 F.3d 488, 490 (10th Cir. 1995) (emphasis in original).

The Supreme Court has described the correct standard for subjecting a municipality to liability under § 1983: "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Services, 436 U.S. 658, 694 (1978). A plaintiff may prove the existence of an official policy or custom in at least five ways: (1) the municipality may be liable for a decision by its properly

constituted legislative body; (2) an official policy exists when the municipal board or agency exercises authority delegated to it by a municipal legislative body; (3) actions by those with final decision-making authority for the municipality constitute official policy; (4) the municipality may be liable for a constitutional violation resulting from inadequate training when its failure to train the lawless employee reflects a deliberate indifference to the plaintiff's constitutionally-protected rights; or (5) the municipality's custom caused the constitutional violation. City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (inadequate training); Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 481-82, 481 n.10 (1986) (municipal legislative action, individual with final decision-making authority, and custom); Monell, 436 U.S. at 694 (agency exercising delegated authority).

Darr has not identified evidence demonstrating that CAB or its chairman's conduct reflects Telluride's official policy or custom. CAB is not a legislative body. Telluride never imbued CAB with authority to speak on its behalf or to discuss personnel issues. CAB did not have any input into Telluride's personnel decisions, and so CAB was not the final decision-making authority for the Town. And there is no evidence that Telluride was deliberately indifferent to Darr's constitutional rights or that Telluride created a custom that caused the alleged constitutional violation.

Instead, Darr asserts that his claim rests upon a negligence theory. Aplt. Reply Br. at 25. For example, Darr states that Telluride's liability is predicated on its negligent supervision of CAB, which is evidenced by its failure to draft a mission statement or charter governing CAB. Aplt. Reply Br. at 26. In sum, Darr argues, "[a]s a result of the

-22-

Town's negligent oversight of its own agency, Darr's liberty interest was violated when he was defamed by the Board at public meetings." Id.

We disagree with Darr's misstatement of the law and with the erroneous conclusion he reaches by applying it. Negligence is not a basis for liability under § 1983, so Darr's arguments must fail. Accordingly, we find no error in the district court's decision to dismiss Darr's liberty-interest claim, but we affirm on the alternative ground that Darr's arguments to us were limited to proving the Town's negligence—an insufficient basis for liability under § 1983.

### C. Substantive Due Process

A public employee with a property interest in continued employment has a substantive-due-process right not to be terminated for arbitrary or capricious reasons. Curtis v. Okla. City Pub. Schs. Bd. of Educ., 147 F.3d 1200, 1215 (10th Cir. 1998) (quoting Tenth Circuit authority for the proposition that "[i]n order to present a claim of denial of 'substantive' due process by a discharge for arbitrary or capricious reasons, a liberty or property interest must be present to which the protection of due process can attach"). But the due process clause does not preclude public employers from maintaining at-will employment relationships that the employer may terminate without cause. See id. Thus, the district court correctly held that the Constitution did not prohibit Telluride from terminating Darr, an at-will employee, without cause.

Nevertheless, a substantive-due-process claim, if viable, requires assessing whether a governmental action is arbitrary, irrational, or shocking to the contemporary

-23-

conscience.  Butler v. Rio Rancho Pub. Schs. Bd. of Educ., 341 F.3d 1197, 1200-01 (10th Cir. 2003); Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998).[5] Telluride's decision to terminate Darr because Darr violated a Town-imposed ethical rule that he respect others on the job and because Darr could no longer effectively perform his duties as a marshal is not arbitrary, capricious, or shocking to the conscience, but is a rational response to the problems posed by Darr's presence as a Telluride marshal.  No reasonable jury could conclude the opposite, and Darr does not dispute that these reasons formed the basis for his termination.  For example, Darr admitted in his deposition that he was unable to effectively perform his job as a marshal because of the public's negative perception of him.  We can think of only a few better reasons to fire an employee than the fact that the employee can no longer perform his job duties because his allegedly hard-nosed conduct generated a poisonous public reaction.

None of Darr's arguments requires a different result.  Indeed, the Perrin v. Egger decision, upon which Darr relies, held that "[b]ecause the [1990] manual did not require cause for termination, there is no contract right to continued employment . . . ." Aplt. Br. at appx. B.  In that decision, as he did here, the district judge found that the plaintiff had a right to a hearing under the old policies, but not a property interest in the employment itself.

_____

[5]Despite a potential dispute over whether the shock-the-conscience test applies to all due process violations, see Tonkovich, 159 F.3d at 528-29, we need not decide the issue in this case because Telluride's conduct does not violate the due process clause under any of the standards.

-24-

Similarly, none of the other decisions that Darr cites supports the proposition that a public employer may not terminate an at-will employee without cause. Wieman v. Updegraff, 344 U.S. 183, 190, 192 (1952), held that a State may not attempt to bar disloyal individuals from its employ by passing a statute imposing a loyalty oath excluding persons solely on the basis of organizational membership, but never decided whether an at-will employee has a substantive-due-process right not to be terminated without cause; Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), considered whether the public employer violated a contract-employee's rights when the employer declined to renew her contract, ostensibly because she was engaged in constitutionally-protected civil-rights protests; and Morris v. Clifford, 903 F.2d 574 (8th Cir. 1990), addressed, in a qualified-immunity context, whether a university's decision not to renew a contract-employee's contract violated the employee's due process right to be free from arbitrary and capricious discharge—a right that the university allegedly created because the university's faculty handbook stated that a tenured faculty member could be dismissed only for adequate cause.

Unlike the plaintiffs in the above cases, Darr was an at-will employee whose employment was terminated after he violated a departmental rule and allegedly antagonized the community with his zealous policing. The substantive-due-process clause does not forbid a public employer from terminating its at-will employees without cause. Regardless, there is no evidence that Telluride terminated Darr based on arbitrary, capricious, or conscience-shocking reasons. Thus, the district court did not err by

-25-

granting summary judgment in Telluride's favor on this substantive due process claim..

## D. State Law Contract Claim

Colorado law creates two contract theories under which a terminated employee can enforce termination procedures set forth in an employee manual.

First, an employee may be entitled to a contract-based remedy if he or she can demonstrate that the employer made an offer to the employee by promulgating the termination procedures and that the employee's initial or continued employment constituted acceptance of and consideration for those procedures. Cont'l Air Lines, Inc. v. Keenan, 731 P.2d 708, 711 (Colo. 1987). The employer's willingness to be bound can be inferred if the manual lacks a disclaimer stating that it does not constitute a contract or if the disclaimer is not clear and conspicuous. Evenson v. Colo. Farm Bureau Mut. Ins. Co., 879 P.2d 402, 409 (Colo. App. 1993). But the existence of a disclaimer is not dispositive. The employer's intent to be bound can be inferred if the manual contains mandatory-termination procedures or requires just cause for termination. Id. If the record evidence creates an issue as to whether an employment contract existed, then summary judgment is inappropriate. Id.

Second, an employee may also be entitled to relief under a promissory-estoppel theory if he or she can demonstrate that (1) the employer should have reasonably expected its employee to consider the employment manual as a commitment from the employer to follow the termination procedures outlined in the manual; (2) the employee reasonably relied on the procedures to his or her detriment; and (3) injustice can be

-26-

avoided only by enforcing the termination procedures. Cont'l Air Lines, Inc., 731 P.2d at 712.

The Colorado Court of Appeals in Evenson addressed an implied-contract claim categorized under the first contract theory identified in Cont'l Air Lines, Inc.—the employer manifested an intent to be bound by the manual. The Evenson court first identified several disclaimer provisions in the plaintiff's employment manual: "Employees have been hired at the discretion of the company and their employment may be terminated at its will and at any time." Evenson, 879 P.2d at 409. Although this was only one of several disclaimers appearing in the manual, Evenson held that a directed verdict was inappropriate because the employee's managers testified that they regarded and applied the disciplinary procedures as mandatory. Id. There was further evidence that the company's CEO discussed compliance with the termination procedures before terminating the plaintiff's employment. Id.

Darr cannot succeed on either of the above contract theories. Contrary to Darr's inaccurate assertions, both the original and revised policies contain a disclaimer, rebutting any facial contention that Telluride manifested an intent to be bound by its policies. Compare Aplt. Br. at 58 (stating that the original policies did not contain a disclaimer), with Appx., Vol. II, at 455, 469 (the old policies' clear statements that they were undergoing revision (a statement appearing on the cover) and that they did not constitute an employment contract (a statement appearing on the first page)). We note that Darr's brief relies on two cases holding that a sufficient disclaimer would include a statement

-27-

that the employment manual is not a contract and cannot become one, or a statement on the first page that the employment manual is a collection of policies, not a contract. Aplt. Br. at 57. The old policies at issue here included similar statements on the cover and on the first page. Appx., Vol. II, at 455, 469.

In light of Darr's admission that the revised policies applied to him, the conspicuous statement on the old policies that they were "Undergoing Revision," and the old policies' statement that they did not create an employment contract, it is clear that Telluride did not manifest an intent to be contractually bound to the old policies merely by promulgating the policies and offering Darr employment.

Darr's promissory-estoppel theory is also unpersuasive. Darr argues that both the old policies and the chief marshal's past decisions to terminate employees with cause created an implied contract not to terminate him without cause. According to Darr, these claims raise a genuine dispute of material fact that the jury must resolve.

But Darr's admission that the new policies applied to him vitiates his reliance claim. He cannot successfully claim that he reasonably relied on the old policies because he simultaneously concedes that only the new policies were in effect. Darr's reliance would be unreasonable as a matter of law because he allegedly relied on policies he knew were inoperative. Moreover, both the old and new policies made clear that they did not constitute an employment contract. Darr even signed a form acknowledging that he received the new manual and acknowledging that he could be terminated with or without cause or a hearing. This language makes it unreasonable as a matter of law for Darr to

rely on either manual as a contract, and it is a legally indefensible position that Telluride should have reasonably expected Darr to ignore this clear language and rely on the manuals.

In addition to Darr's fatal admission regarding the old policies' expiration, the new policies clearly informed employees that the Town intended to maintain an at-will employment policy regardless of other provisions in the policies or the way in which the Town terminated its employees. Neither Telluride nor Darr could reasonably believe that the new policies constituted a binding contract or that the chief marshal's alleged behavior could alter this clear language.

Accordingly, we conclude that Darr did not present sufficient evidence in his favor to defeat Telluride's motion for summary judgment on this state law contract issue.

## III. CONCLUSION

The Town constitutionally revised the old policies, Darr cannot subject the Town to liability under § 1983 for acting negligently, Darr lacked a substantive-due-process right in continued employment, and Darr's employment manuals did not amount to contracts with Telluride. Thus, the district court did not err by granting Telluride's summary-judgment motion and dismissing Darr's federal and state claims. The district court's decision is therefore

**AFFIRMED.**