FILED
United States Court of Appeals
Tenth Circuit

September 2, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES SANCHEZ,

Plaintiff - Appellant,

v.

PHILIP L. DUBOIS, former President of the University of Wyoming in his individual capacity; GARY BARTA, a former Athletic Director for the University of Wyoming in his individual capacity; BARBARA BURKE, Associate Athletic Director for the University of Wyoming in her individual capacity; UNIVERSITY OF WYOMING BOARD OF TRUSTEES,

Defendants - Appellees.

No. 07-8074

(D. Wyoming)

(D.C. No. 06-CV-258-ABJ)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Introduction

James Sanchez brought this action under 42 U.S.C. § 1983 against his former employer and several of its directors. He asserted that he was deprived of a liberty interest without due process when he was discharged from his job as the head cross country coach at the University of Wyoming, in violation of the Fifth and Fourteenth Amendments. The district court granted the defendants' motion for summary judgment, ruling, *inter alia*, they had not violated Sanchez's liberty interest and were entitled to qualified immunity. Sanchez appeals the district court's qualified immunity ruling. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court because Sanchez cannot establish that the defendants violated a constitutional right.

## II. Background

In the fall of 2003, Sanchez was employed as the head cross country coach and assistant track coach at the University of Wyoming. He had served in that position for over twenty-two years when he was fired on November 4, 2003, by Gary Barta, the University's Director of Athletics. Sanchez received a letter, informing him that he was being terminated, "pursuant to Paragraph 3(a) of the Employment Agreement." Paragraph 3(a) provides:

> The President of the University may terminate Employee's appointment without notice for any of the following reasons: [c]onduct unbecoming of a member of the University athletic staff or which brings discredit to the University; mental or physical inability to perform duties; act of insubordination to any superior University

officials; acts of malfeasance, misfeasance, or nonfeasance in office; or deliberate and serious violations of any institutional regulations, policies or procedures; and conference or NCAA legislation. An athletic employee who is found in violation of NCAA regulations shall also be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures.

Prior to Sanchez's termination, the coach had been reprimanded on numerous occasions for his poor performance. For example, his evaluations from 1997-2003 reflect that he was habitually late for work, was often unavailable during the day, failed to monitor student athletes, had done a poor job recruiting student athletes, had inadequately handled paperwork, and appeared to have lost interest in coaching. Sanchez also mishandled an incident involving a missing student athlete. An investigation by the school revealed that he had neglected to investigate the missing student when she failed to show up for practice for over a week. Although Sanchez told school authorities he had tried to track down the student, his story contained several inconsistencies. For example, Sanchez told his superiors that he talked to the missing student's roommate, when in fact she did not have a roommate. Further, during the school's investigation of the missing student, it became clear that Sanchez had held an unreported and unsanctioned practice for the cross country team on Saturday, September 27, 2003. Under the National Collegiate Athletic Association ("NCAA") bylaws, strict limitations are placed on the number of hours a student athlete may practice in any given week. There is also a concomitant reporting requirement.

University officials learned that Sanchez had been present at the Saturday practice and it therefore should have been included in the NCAA reports. That practice, however, had not been reported to the NCAA.

Soon thereafter, Barta called a meeting attended by Barbara Burke, the Deputy Director of Athletics, and other members of the athletic department. The group discussed Sanchez's record at the school, his failure to make his superiors aware of the missing cross country runner, their belief that Sanchez lied about his attempts to locate her, and his failure to log the Saturday practice on the NCAA reporting sheets, as well as other performance-related issues. The group was in agreement that Sanchez should be terminated.

On November 4, 2003, the University released a statement to the press explaining Sanchez had "been terminated from his position, effective immediately, for violating terms of his contract." The press release did not elaborate on the reasons for termination. The following day, a campus newspaper, the Branding Iron, published a story about Sanchez's termination. [Id. at 19] The article stated Sanchez was fired for violating Paragraph 3(a) and quoted the language from the contract.

Neither the school's press release nor the Branding Iron's story mentioned Sanchez's alleged NCAA violation for failing to report a practice. Sanchez, however, issued his own press release on November 6, 2003. In that release, Sanchez admitted that he exercised "poor judgment" and alluded to "sloppy

adherence to NCAA rules and regulations." He claimed, however, he was being made a scapegoat. The Casper-Star Tribune ran an article the following day in which Sanchez's accusations against the University were aired. The University confirmed that it might have cause to file a report with the NCAA for a minor infraction, or a "secondary violation," related to the cross country program. Both Barta and Philip Dubois, University of Wyoming's former President, acknowledged, however, that the violation was not the primary reason for Sanchez's termination.

The University of Wyoming filed a secondary violation report two weeks later. Filed by the Assistant Athletic Director for Compliance, Matthew J. Whisenant, the letter informed the NCAA that Sanchez had violated NCAA Bylaw 10, which governs unethical conduct. Specifically, the letter stated:

> On October 2, 2003, the Senior Associate Athletic Director and the Assistant Athletic Director for Compliance met with the Head Cross Country Coach, Jim Sanchez. During that discussion, Coach Sanchez stated he did not conduct a practice on Saturday, September 27th. Furthermore, Coach Sanchez handed-in his Athletically-Related Activities Weekly Time Sheet for the week of September 21 through September 27, which also showed that he did not conduct a practice (on the 27th). However, it came to the attention of the Senior Associate Athletic Director and the Assistant Athletic Director for Compliance that a practice was conducted. This was confirmed through numerous random interviews with members of the cross country team and our Academic Coordinator . . ., who ran with the team that day.
>
> . . . Thus, due to the unethical nature of this violation and other serious issues which were unrelated to NCAA rules/regulations,

the University of Wyoming decided that the appropriate action was to immediately terminate the coach's contract.

The letter was copied to members of the University's Athletic Department, legal counsel, and the Associate Commissioner for Compliance for the Mountain West Conference. The Casper-Star Tribune reported on January 11, 2004, that the University of Wyoming had filed a secondary violation report with the NCAA.

Over eighteen months after his termination, Sanchez requested a name-clearing hearing, which the University denied. Sanchez thereafter brought this wrongful termination suit pursuant to § 1983 against Philip Dubois, Gary Barta, and Barbara Burke in their individual capacities.[1] Sanchez alleged the University deprived him of his liberty interest without due process of law and sought compensatory damages. The district court granted the defendant's motion for summary judgment, concluding they were entitled to qualified immunity.

## III. Discussion

The sole question on appeal is whether the district court properly concluded the defendants were entitled to qualified immunity. We review de novo a district court's summary judgment decision regarding qualified immunity. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc). The evidence is viewed in the light most favorable to the non-moving party. *Id.* Summary

---

[1]Sanchez also brought suit against the University of Wyoming in the wrongful termination action. He does not, however, appeal the district court's conclusion that the Eleventh Amendment bars his suit against the University.

judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The defendants, as public officials, are entitled to qualified immunity "from individual liability in a § 1983 action unless the officials violated 'clearly established . . . constitutional rights of which a reasonable person would have known.'" *Workman v. Jordan*, 32 F.3d 475, 478-79 (10th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts a qualified immunity defense on summary judgment, "the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right. 'If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.'" *Cortez*, 478 F.3d at 1114 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (citation omitted). Only if the defendants violated a constitutional right does this court move on to address whether the constitutional right was clearly established. *Saucier*, 533 U.S. at 201.

Sanchez argues he was deprived of a liberty interest without due process of law. His liberty claim is based on damage to his reputation due to allegedly stigmatizing statements made in the University of Wyoming's secondary violation report to the NCAA. *See Workman*, 32 F.3d at 480-81. Specifically, he argues

the letter falsely accuses him of engaging in unethical behavior, which unconstitutionally impugned his good name and honor, and the defendants declined to provide him with an adequate name-clearing hearing.

An employee has a "liberty interest in his good name and reputation as it affects his protected property interest in continued employment." *Id.* at 480 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)); *see also Melton v. City of Okla. City*, 928 F.2d 920, 927 (10th Cir. 1991) (stating a public employee has a claim for relief when he is terminated "based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities"). For a public official to infringe on this liberty interest, four factors must be met:

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of a liberty interest.

*Workman*, 32 F.3d at 481 (citations omitted).[2]

---

[2]A recent case, *Darr v. Town of Tulluride*, suggests the third *Workman* factor should be composed in the conjunctive, rather than the disjunctive. 495 F.3d 1243, 1255 (10th Cir. 2007). Like *Darr*, we need not resolve this issue because Sanchez's claim fails on the fourth prong. *Id.* at 1255 n.4.

In this case, we need not consider all four *Workman* factors.  Sanchez fails

to state a claim because he cannot demonstrate that the statements made to the

NCAA were published.[3]  *See Bishop v. Wood*, 426 U.S. 341, 348 (1976) (holding

a non-public communication "cannot properly form the basis for a claim that

petitioner's interest in his good name, reputation, honor, or integrity" has been

impaired) (quotation omitted).  Although documents maintained by the University

or NCAA may be deemed published if there is a likelihood that the information

will be disclosed to prospective employers, Sanchez cannot establish that the

secondary violation report is anything but confidential.  *Brandt v. Bd. of Co-op*

*Educ. Servs.*, 820 F.2d 41, 44-45 (2d. Cir. 1987); *see also Sims v. Fox*, 505 F.2d

857, 864 (5th Cir. 1974) (en banc) (explaining the presence of derogatory

information in confidential files is not public).  By way of affidavit, the NCAA's

Director of Enforcement for Secondary Infractions testified that secondary

violations are "confidential documents." Although a summary of the infraction is

available to the general public, the summary is scrubbed of both the coach's and

University's name.  Sanchez, however, argues there is a likelihood that the

violation will become known to future employers, who may call the NCAA to

---

[3]To the extent Sanchez appeals the district court's ruling based on the other statements made by University officials in the Branding Iron and Casper-Star Tribune, we affirm the district court based on its finding that the statements were true and thus cannot form the basis of a due process claim. *See Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994) (explaining to be actionable the statements must be false).

check into the background of a job candidate. Although major violations are readily available to potential employers, information on secondary violations, such as this one, "is not available to member institutions unless the coach in question has been placed on a special disciplinary status under a 'show cause' provision of the NCAA Bylaws." Appellee's App. at 34. The undisputed evidence establishes that "Coach Sanchez was not under such a status, and no information would be provided concerning any secondary violation with which he might have been involved." *Id.*

Thus, even assuming the secondary violation contained false statements impugning Sanchez's good name and reputation, it was never published, and thus cannot form the basis of a § 1983 claim. The failure to establish a deprivation of a liberty interest negates any viability of Sanchez's claim that he was entitled to a name-clearing hearing. *Workman*, 32 F.3d at 482. Because the defendants established that "no constitutional right would have been violated were the allegations established," *Saucier*, 533 U.S. at 201, they are entitled to qualified immunity.

## IV. Conclusion

For the foregoing reasons, this court **affirms** the judgment of the district court.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge