**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 8, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICHARD SIMON; JANELLE SIMON,

    Plaintiffs - Appellants,

and

ERIC CURTIS; JOSE VEGA,

    Plaintiffs,

v.

HEATH TAYLOR; JERRY WINDHAM;
PAT WINDHAM; MARTY L. COPE;
ARNOLD J. RAEL; B. RAY WILLIS;
THOMAS FOWLER; LARRY
DELGADO; THE NEW MEXICO
RACING COMMISSION,

    Defendants - Appellees.

No. 17-2088
(D.C. No. 1:12-CV-00096-JB-WPL)
(D. N.M.)

_____

**ORDER**
_____

Before **BACHARACH**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

This matter is before the court *sua sponte*. On November 7, 2019, the court issued

its Order & Judgment in this matter. After the Order & Judgment was issued, an

inadvertent clerical error was discovered in footnote 3 on page 8 of the dissent. In order

to correct that clerical error, the Clerk of Court shall reissue Order & Judgment with the

attached corrected version of the dissent, effective *nunc pro tunc* to the date that the

original Order and Judgment was filed.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

by: Chris Wolpert
    Chief Deputy Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

RICHARD SIMON; JANELLE SIMON,

    Plaintiffs - Appellants,

and

ERIC CURTIS; JOSE VEGA,

    Plaintiffs,

v.

HEATH TAYLOR; JERRY WINDHAM;
PAT WINDHAM; MARTY COPE;
ARNOLD J. RAEL; B. RAY WILLIS;
THOMAS FOWLER; LARRY
DELGADO; THE NEW MEXICO
RACING COMMISSION,

    Defendants - Appellees.

No. 17-2088
(D.C. No. 1:12-CV-00096-JB-WPL)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

This appeal concerns the outcome of a New Mexico horse race that took place

over a decade ago. Plaintiffs Richard and Janelle Simon own the horse that crossed

_____

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. _See_ Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

the finish line in second place.[1] The Simons allege that the New Mexico Racing Commission and its individual commissioners (collectively, the Commission) deprived them of procedural due process when the Commission refused to let them participate in a disciplinary proceeding against Heath Taylor, the trainer of the horse that crossed the finish line in first place. The Simons also brought various tort claims against Taylor and the owners of the first-place horse, Jerry and Pat Windham. The district court granted the Commission's motion to dismiss and later awarded summary judgment to Taylor and the Windhams. For the reasons discussed below, we affirm.

## Background

Jet Black Patriot, the Simons' horse, crossed the finish line in second place in the 2008 All American Futurity horse race. Stolis Winner, the Windhams' horse, crossed the finish line in first place, just ahead of Jet Black Patriot. This first-place finish came with a $1 million prize; for second place, the prize was $285,000.

After the race, a licensed veterinarian collected blood and urine samples from each participating horse, including Jet Black Patriot and Stolis Winner. Stolis Winner's samples tested positive for a small amount of caffeine, which was a banned substance under the Commission's regulations.

This positive test result prompted the race stewards, who supervise races and

---

[1] The Simons brought this case along with Eric Curtis, their horse trainer, and Jose Vega, their horse jockey. For simplicity, we refer to the plaintiffs collectively as "the Simons" throughout (even though not every individual plaintiff participated in each stage of the administrative proceedings below).

enforce racing regulations, to conduct a disciplinary hearing. At that hearing, the stewards ruled against Stolis Winner and Taylor and entered two orders. The first order assessed penalties against Taylor and revoked the first-place prize money. The second order disqualified Stolis Winner, reordered the race finishers, listed Jet Black Patriot in first place, and ordered the prize money redistributed. Taylor appealed to the Commission, and the Commission appointed a three-person panel to conduct the disciplinary appeal.

The Simons filed a motion to participate in the disciplinary appeal. The three-person panel concluded that the Simons' "sole interest [was] in the distribution of the purse." App. vol. 2, 315. But the aim of the Commission's "quasi-criminal" disciplinary proceeding was "to penalize individuals who violate Commission rules and regulations." *Id.*; *see also* N.M. Code R. § 15.2.1.9(C)(1)(d) (providing that "non[]party to a proceeding who wishes to appear in a contested case pending before the [C]ommission must prove that he/she has an [a]ffected interest sufficient to create standing in the case"). As such, the panel denied the Simons' motion to participate, and the Commission adopted that ruling.

The panel conducted the disciplinary appeal over three days in May 2010. It first explained that the positive caffeine test was merely "prima facie evidence" that Taylor was responsible for the drug's presence in Stolis Winner's system. App. vol. 2, 335 (quoting N.M. Code R. § 15.2.6.11(A)). And it found that Taylor successfully rebutted the prima facie case by showing that (1) there was "substantial evidence of caffeine contamination of the equine environment to which Stolis Winner

3

was exposed"; and (2) "[t]he amount of caffeine detected in the post[]race testing was *de minimis* and insufficient to constitute a violation in many jurisdictions." *Id.* at 335–36. As a result, the panel recommended that the Commission rule in Taylor's favor, reverse the stewards' orders, and reinstate Stolis Winner's first-place finish. The Commission later adopted the panel's decision in full.[2]

The Simons then filed this action in federal district court.[3] As relevant here, they alleged that the Commission violated their right to procedural due process. Specifically, the Simons asserted that the Commission deprived them of a protected property interest without due process of law when it reversed the stewards' orders without allowing the Simons to participate in the disciplinary appeal. The district court concluded that the Simons failed to establish a protected property interest in the first-place prize money. It therefore granted the Commission's motion to dismiss.

The Simons also asserted a variety of tort claims against Taylor and the Windhams. They based these claims on the theory that Taylor and the Windhams either intentionally or negligently drugged Stolis Winner, thereby causing Jet Black Patriot to finish second. Taylor and the Windhams filed a motion to dismiss, which

---

[2] The Simons appealed the Commission's decision by filing a petition for a writ of certiorari in New Mexico state court. The state court initially granted the writ, but it later administratively closed the appeal for lack of prosecution.

[3] The Simons previously filed a similar action in a Texas federal district court; that action was pending during most of the proceedings before the three-person panel and the Commission. After those proceedings concluded, the Texas district court dismissed the Simons' claims. *See Simon v. Taylor*, 455 F. App'x 444, 445 (5th Cir. 2011) (unpublished). The Simons appealed to the Fifth Circuit, and that court dismissed without prejudice for lack of jurisdiction. *Id.* at 446.

the district court largely denied. But after the parties cross-moved for summary judgment, the district court granted summary judgment in favor of Taylor and the Windhams.

The Simons appeal both the due-process ruling and the tort rulings.

**Analysis**

**I.     Due-Process Claim**

The Simons contend that the district court erred in dismissing their due-process claim against the Commission. We review that ruling de novo. *See Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1057 (10th Cir. 2019).

The Fourteenth Amendment to the United States Constitution guarantees that a state won't deprive a person of "property[] without due process of law." U.S. Const. amend. XIV, § 1. In practice, this means that a state can't take away a person's property "unless fair procedures are used in making that decision." *Mitchell v. City of Moore*, 218 F.3d 1190, 1198 (10th Cir. 2000) (quoting *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991)). But to prevail on a due-process claim, "a plaintiff must first establish that a defendant's actions deprived plaintiff of *a protect*[*ed*] *property interest.*" *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (emphasis added).

Protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). That is, to establish a property interest, a plaintiff must point to "an independent source such as

5

state law." *Id.* And that independent source must provide something "more than a unilateral expectation" of receiving a benefit; it must establish "a legitimate claim of entitlement" to a benefit. *Id.* In other words, the relevant state law must be couched in language that "is so mandatory that it creates a right to rely on that language[,] thereby creating an entitlement that could not be withdrawn without due process." *Cosco v. Uphoff*, 195 F.3d 1221, 1223 (10th Cir. 1999); *see also Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1178 (10th Cir. 2016) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").

Here, the Simons point to two related sources for the existence of their alleged property interest in the first-place prize money: (1) the statute and accompanying regulations that govern horse racing in New Mexico, and (2) the stewards' orders disciplining Taylor and placing Jet Black Patriot in first place. In particular, the Simons contend that "Stolis Winner's positive caffeine result and the Commission's clear zero[-]tolerance policy for caffeine" *required* the stewards to disqualify Stolis Winner and award first place to Jet Black Patriot. Aplt. Br. 26. To begin, we question whether that is an accurate characterization of the regulations; indeed, the district court found to the contrary and concluded that the stewards have discretion when enforcing the zero-tolerance policy and imposing penalties. But even if we assume the Simons are correct that the regulations required disqualification, we would nevertheless find no property interest here.

That's because even if the regulations required the stewards to disqualify

6

Stolis Winner and award the purse to Jet Black Patriot, as the stewards in fact did, such a decision isn't final. Rather, the stewards' orders plainly state that they are appealable. The one reordering the finishers provides a 20-day deadline for filing the appeal "at the main [C]ommission offices or with the [s]tewards who issued the ruling." App. vol. 2, 352. The same language appears in the disciplinary order against Taylor. And the notices in the orders align with New Mexico law. By statute, "[a] decision or action of a steward may be reviewed or reconsidered by the [C]ommission." N.M. Stat. Ann. § 60-1A-12. Similarly, race regulations provide that a stewards' order "*shall* inform the person of the person's right to appeal the ruling to the Commission." § 15.2.1.9(B)(7)(e) (emphasis added). Further, and perhaps most critically, the regulations provide that *if an appeal is pending*, the prize money won't be distributed until after "receipt of dismissal or a final nonappealable order disposing of such . . . appeal." N.M. Code R. § 15.2.3.8(D)(4)(e). That is, until the completion of an appeal, any right to prize money is contingent on the results of that appeal. Thus, neither the regulations nor the orders are couched in language that "is so mandatory that it creates a right to rely on that language." *Cosco*, 195 F.3d at 1223.

For contrast, consider *Barry v. Barchi*, 443 U.S. 55, 64 & n.11 (1979). There, the Supreme Court recognized a protected property interest in a horse trainer's license because under the relevant state law, "a license [could] not be revoked or suspended at the discretion of the racing authorities." *Barry*, 443 U.S. at 64 n.11. This lack of discretion "engendered a clear expectation of continued enjoyment of a

7

license absent proof of culpable conduct by the trainer." *Id.* But here, the stewards' orders were explicitly subject to appeal and therefore did not "engender[] a clear expectation of continued enjoyment" of the first-place position and accompanying prize money. *Id.* Moreover, the Simons can point to no statute or regulation that limits the Commission's discretion once a party opts to appeal a decision of the stewards. Thus, as the district court concluded, "[t]he [s]tewards' initial decision to reorder the race was . . . subject to the . . . Commission's essentially plenary review." App. vol. 3, 918. That conclusion flows from both the regulations and the orders themselves. And because the Commission "retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue, no property interest is implicated." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1217 (10th Cir. 2003).

The Simons cite *Edelberg v. Illinois Racing Board*, 540 F.2d 279, 283 (7th Cir. 1976), in support of their assertion of a property interest in the first-place prize money. But *Edelberg* supports the opposite conclusion. There, an Illinois horse-racing regulation provided that a horse must pass a drug test before receiving prize money; in other words, if a horse tested positive for drugs, any prize money won by that horse would be automatically withheld and redistributed. *Edelberg*, 540 F.2d at 282. The plaintiffs, owners of winning horses who tested positive for drugs, argued that this regulation deprived them of their property right in the prize money. *Id.* But the Seventh Circuit held that the plaintiffs had no property interest in the prize money "until after a laboratory finding that their horse was not drugged." *Id.* at 284. It read

8

the regulation as "creat[ing] a condition precedent to [e]nsure a legitimate race" rather than "depriving plaintiffs by a forfeiture." *Id.* at 283.

Here, similarly, the Simons had no interest in the first-place prize money until the conclusion of the disciplinary proceedings against the first-place finisher. The appeal regulations create "condition[s] precedent to [e]nsure a legitimate race," thereby negating any argument that other parts of the regulations create a property interest in prize money. *Id.* As such, we conclude that the Simons lacked a protected property interest in the first-place prize money.[4] And because the Simons fail to establish a protected property interest, we affirm the district court's order granting the Commission's motion to dismiss their due-process claim. In so doing, we do not reach the Commission's various alternative arguments for affirming.

---

[4] Although neither party discusses it, the indirectness of the alleged property interest further supports our conclusion that the Simons lacked a protected property interest in the prize money. There is a "simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 767 (2005) (alteration in original) (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788 (1980)). And here, notably, "the alleged property interest . . . arises *incidentally*," from state action directed at Taylor, rather than directly, from state action directed at the Simons. *See id.* at 766 (citing indirect nature of benefit at issue—right to have restraining order enforced—as one reason for finding that right wasn't protected by due process); *O'Bannon*, 447 U.S. at 786–87 (holding that nursing-home residents lacked protected property interest in Medicaid's decertification of nursing home; distinguishing between direct Medicaid benefits, which are property interests that can't be taken away without due process, and "the [g]overnment's attempt to confer an *indirect benefit* on Medicaid patients by imposing and enforcing minimum standards of care on [nursing-home] facilities" (emphasis added)).

## II.     Tort Claims

The Simons also challenge the district court's summary-judgment order rejecting their state-law tort claims. Again, our review is de novo, and we apply the same standard used by the district court. *Darr v. Town of Telluride*, 495 F.3d 1243, 1250 (10th Cir. 2007). Under that standard, we will affirm an order granting summary judgment if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As such, we begin by summarizing some key and undisputed facts. We take the bulk of these undisputed facts from the district court's order granting summary judgment to Taylor and the Windhams. In doing so, "[w]e view the evidence in the light most favorable to, and draw all reasonable inferences in favor of" the Simons as nonmoving party. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018).

First, postrace tests revealed approximately 84 to 125 nanograms of caffeine per milliliter in Stolis Winner's urine. At the time of the race, caffeine was a prohibited substance under New Mexico's racing regulations. But Taylor and the Windhams testified that they didn't provide caffeine to the horse or instruct anyone else to do so; nor did they know that the horse had ingested any caffeine.

Instead, Taylor and the Windhams presented undisputed evidence that (1) "[c]affeine is a known environmental contaminant," and (2) "immediately before and after the race, many people were in close proximity to Stolis Winner under circumstances that did not control for ambient caffeine contamination." App. vol. 7,

10

1940, 1946. The uncontroverted evidence further showed that environmental caffeine contamination is a common problem, to the extent that industry standards typically account for it by allowing for caffeine levels up to 100 nanograms per milliliter in a horse's blood or 300 nanograms per milliliter in a horse's urine.[5] Moreover—and critically—the undisputed evidence also established that low levels of environmental caffeine contamination do not affect a horse's performance. So, according to these undisputed facts, the 84 to 125 nanograms of caffeine in Stolis Winner's urine "is associated with environmental exposure to caffeine and, to a scientific certainty, has no performance effect." *Id.* at 2017.

Based on these facts, the district court found that the Simons' evidence—which consisted exclusively of the positive caffeine results—failed to create any genuine issues of fact precluding summary judgment for Taylor and the Windhams on each of the tort claims. The Simons dispute this conclusion on appeal. We group our discussion of these claims according to how we resolve them.

## A.    Negligence Per Se and Implied Cause of Action

The Simons challenge the district court's order rejecting their claims for negligence per se and implied cause of action. As we explain more fully below, we affirm the district court's decision because both torts require proof of causation. And

---

[5] In fact, New Mexico later recognized as much: sometime after the events of this case, New Mexico adopted a regulation that prohibits disciplinary action based on low-level caffeine contamination. *See* § 15.2.6.9(L)(3) (providing that "[d]isciplinary action shall only be taken if test sample results exceed . . . 100 nanograms [of caffeine] per milliliter of plasma").

11

the undisputed scientific evidence in this case demonstrates that the amount of caffeine in Stolis Winner's urine did not affect the horse's performance. Accordingly, the Simons can't show that Taylor and the Windhams caused the Simons' horse to finish second.

We begin with negligence per se. Under that doctrine, a plaintiff must show that an administrative regulation created a duty; establish that the defendant breached his or her duty by failing to comply with the regulation; and prove causation and damages. *See Heath v. La Mariana Apartments*, 180 P.3d 664, 666 (N.M. 2008) (describing negligence per se); *Herrera v. Quality Pontiac*, 73 P.3d 181, 185–86 (N.M. 2003) (describing four elements of negligence). Here, the district court rejected the Simons' negligence claim for two independent reasons: they failed to show breach of the applicable regulation, and they failed to show that any breach caused their horse to lose first place.

As the Simons point out, and as Taylor and the Windhams concede, the district court's basis for reaching the first of these two reasons was flawed. In finding no breach of the applicable regulations, the district court relied on the amended regulations rather than the regulations in place at the time of the race. *See supra* note 5; *Hale v. Basin Motor Co.*, 795 P.2d 1006, 1011 (N.M. 1990) ("Substantive duties, rights, and obligations arise under and are determined by the law in effect at the time of the conduct in question."); *Carrillo v. My Way Holdings, LLC*, 389 P.3d 1087, 1091–92 (N.M. Ct. App. 2016) (holding that new statute governing exclusion of horses from racetrack didn't apply retroactively). And unlike the amended regulation,

12

the regulation in place at the time imposed a zero-tolerance policy. We therefore assume that the zero-tolerance policy imposed a duty to prevent any amount of caffeine from entering the horse's system and that the Simons have shown a breach by way of Stolis Winner's positive caffeine results. *See Heath*, 180 P.3d at 666.

But the Simons' claim for negligence per se nevertheless falters at causation. The Simons allege that "but for" Taylor and the Windhams' breach of the zero-tolerance policy, the Simons' "horse would have won the race." App. vol. 7, 2028 (quoting App. vol. 5, 1142). Yet as the district court noted, "[t]he relevant scientific community does not associate . . . the amount of caffeine . . . estimated to be [in] Stolis Winner's urine with any performance effect in a horse." *Id.* at 2034. The Simons nowhere challenge or contest this fact. And because of this fact, a reasonable jury could not conclude that the small amount of caffeine in Stolis Winner's body affected the horse's performance and thus caused Jet Black Patriot to finish second, rather than first.

Arguing to the contrary, the Simons cite *Johnson v. Board of Stewards of Charles Town Races*, 693 S.E.2d 93 (W. Va. 2010). There, the plaintiffs asserted that a zero-tolerance racing regulation was unconstitutional as applied to them because the very low levels of caffeine detected in their horse didn't affect their horse's performance. *Johnson*, 693 S.E.2d at 95. The West Virginia Supreme Court rejected this argument, noting that the regulation withstood rational-basis review in part because it prevented "endless litigation and debates concerning whether a particular horse was affected by a particular substance." *Id.* at 98. In other words, the absence

13

of any effect on the horse's performance didn't render the rule unconstitutional because there were other rational reasons to have such a rule. But *Johnson* offers no guidance on the causation question at issue here. That is, it doesn't address a negligence claim premised on an amount of caffeine so small that from an uncontested scientific standpoint, it could not have affected a horse's performance. Thus, *Johnson* doesn't support the Simons' position. We therefore affirm the district court's ruling rejecting their negligence claim.

For the same reason, we affirm the district court's ruling on the Simons' claim for implied cause of action.[6] Like negligence per se, this claim also requires proof that Taylor and the Windhams' actions caused the harm that the Simons complain of. *See Yedidag v. Roswell Clinic Corp.*, 346 P.3d 1136, 1148 (N.M. 2015) (noting that for implied cause of action, party can recover damages when conduct taken in contravention of statute "results in damage" to that party (quoting *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916))). And, as the defendants point out, in light of the undisputed scientific evidence, the Simons cannot establish that the miniscule amount of caffeine in Stolis Winner's urine affected the horse's performance and caused the Simons' horse to lose first place.[7]

---

[6] The district court didn't rely on a lack of causation to award summary judgment to Taylor and the Windhams on this claim. Instead, the district court erroneously relied on the amended regulations to reject the implied cause of action. But we are free to affirm the district court for any reason supported by the record. *See D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1231 (10th Cir. 2013). We do so here.

[7] Alternatively, even assuming that the Simons could establish causation for purposes of an implied cause of action, we would nevertheless affirm because, as a

14

## B. Intentional Interference with Prospective Economic Advantage

The Simons next assert that the district court erred in rejecting their claim for intentional interference with prospective economic advantage. This tort requires a plaintiff to show, among other things, that a defendant acted with "an improper motive (solely to harm [the] plaintiff)." *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 841 (N.M. 1981) (quoting *M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 246 (N.M. Ct. App. 1980)). This is a high level of intent; it's higher, for example, than what's required for the tort of intentionally interfering with an *existing* contract. *See Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003) (explaining that "for a claim based on an interference *with an existing* contract, the plaintiff must still prove that the defendant acted with either an improper motive or improper means, but the improper motive need not be the sole motive," whereas claim for interference with

threshold matter, the district court erred in recognizing an implied cause of action in this case. In doing so, the district court relied on a case in which the New Mexico Court of Appeals found an implied cause of action in a statute related to historical preservation. *See Nat'l Tr. for Historical Pres. v. City of Albuquerque*, 874 P.2d 798, 802 (N.M. Ct. App. 1994). But the statute in that case specifically stated that its provisions could "be enforced by an action for injunction," and merely failed to provide who could bring such an action. *Id.* at 800 (quoting N.M. Stat. Ann. § 18-8-7). In that situation, the New Mexico court concluded that when "the governing statute is silent regarding *who may bring a statutorily recognized action*," any injured private party can do so. *Id.* at 802 (emphasis added). But in this case, the zero-tolerance regulation contains no "express language . . . creating a private right of action." *Eisert v. Archdiocese of Santa Fe*, 207 P.3d 1156, 1165 (N.M. Ct. App. 2009) (refusing to find implied cause of action in criminal statute that lacked express language). As such, even assuming that the Simons could show causation, we would affirm the district court's rejection of this claim on the alternative ground that the zero-tolerance regulation doesn't contain express language creating an implied cause of action.

15

prospective contract requires proof that improper motive was sole motive (emphasis added)).

Here, the district court concluded that the positive caffeine test was "some evidence of [an] improper intention to interfere with the [Simons'] prospective economic advantage." App. vol. 7, 2009. But it found that this evidence wasn't sufficient to create a fact issue in light of the other undisputed evidence: that Taylor and the Windhams denied administering caffeine to the horse, that environmental contamination meant caffeine is "ubiquitous in our environment," and that the miniscule amount of caffeine at issue here was likely the result of such environmental contamination. *Id.* at 2012–13. On appeal, in one and a half pages of argument, the Simons acknowledge that this other undisputed evidence "maybe raised a question of fact," but they assert that it didn't entitle Taylor and the Windhams to summary judgment. Aplt. Br. 45. In support, they rely only on the positive caffeine test and do not point to any other piece of evidence.

We question the district court's initial conclusion that the positive caffeine result was some evidence that Taylor and the Windhams acted with the sole and improper motive of harming the Simons. Nevertheless, we assume for purposes of our analysis that a reasonable factfinder could infer—from nothing more than test results showing an extremely small concentration of caffeine in a horse's urine—that the horse's owners or trainers intentionally administered caffeine to that horse, and that they did so solely with an improper motive. Yet, as the district court found, Taylor and the Windhams effectively rebutted this prima facie evidence and

16

accompanying inference with two critical facts: (1) they asserted that they did not

administer caffeine to Stolis Winner, and (2) they showed that the very low

concentration of caffeine in Stolis Winner's urine was likely the result of

environmental contamination.[8]

Regarding environmental contamination specifically, the undisputed evidence

at summary judgment established that environmental caffeine contamination is

common and often causes horses to test positive for low levels of caffeine in their

urine, at or below 300 nanograms per milliliter. The amount of caffeine in Stolis

Winner's urine, 84 to 125 nanograms per milliliter, was well below the

---

[8] The dissent disputes the impact of these two facts. But in so doing, it relies on a variety of arguments that the Simons simply do not advance on appeal, including challenging the district court's decision to take judicial notice of certain scientific studies and further challenging the district court's interpretation of those studies. And we typically decline to consider arguments that appellants fail to raise. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1269 (10th Cir. 2016) (declining to consider argument not raised on appeal). Further, we question the dissent's assertion that Taylor and the Windhams' affidavits denying responsibility for the caffeine in Stolis Winner's system do not rebut the Simons' prima facie evidence of intent. But even if we were to accept the dissent's position, the affidavits aren't the only rebuttal evidence; Taylor and the Windhams also presented environmental-contamination evidence.

The dissent insists that because Taylor and the Windhams presented this environmental-contamination evidence in connection with their motion for summary judgment on negligence, the district court erred in relying on that evidence when considering the intentional-interference claim. But the district court's summary-judgment order treated the factual background for the Simons' various tort claims collectively, as a set of facts relevant to each claim. Notably, the Simons don't challenge the district court's methodology on appeal. Thus, like the district court, we decline to distinguish between undisputed facts relevant to the negligence claim and undisputed facts relevant to the intentional-interference claim.

17

environmental-contamination threshold. To put a finer point on it, the Simons "d[id] not dispute [Taylor and the Windhams'] factual allegation that, within the horse racing industry, levels of caffeine of . . . 300 ng/ml in urine" are the result of "environmental contamination." App. vol. 7, 2016. Thus, the undisputed environmental-contamination evidence, when combined with the Taylor and the Windhams' affidavits denying that they administered caffeine to the horse, effectively rebutted any inference of improper motive permitted by the Simons' prima facie evidence. As such, the burden shifted to the Simons, as the party that would bear the burden of persuasion at trial, to rebut that evidence. *See James v. Wadas*, 724 F.3d 1312, 1319 (10th Cir. 2013) (explaining that after summary-judgment movant met burden of production showing nonliability, nonmoving plaintiff who bore burden of persuasion at trial was required to come "forward [with] specific facts showing a genuine issue for trial"). But the Simons didn't meaningfully dispute the environmental-contamination evidence below;[9] nor do they do so on appeal. Instead, on appeal, they again rely *only* on the positive caffeine test, arguing that it's sufficient to create a fact issue despite the environmental-contamination

---

[9] Rather than dispute the environmental-contamination evidence, the Simons primarily argued that such evidence was irrelevant given the zero-tolerance rule about caffeine. They did arguably attempt to dispute the existence of environmental contamination in this case, pointing to (1) a regulation that renders a horse's trainer responsible for the horse "from the time the horse ends the race to the time the horse leaves the test barn," and (2) testimony from the veterinarian who conducted the testing in this race that the testing barn wasn't contaminated with caffeine. App. vol. 5, 1129. But these pieces of evidence rebut only the existence of environmental contamination from the end of the race through the end of testing—they say nothing about environmental contamination in the days and hours leading up to the race.

18

evidence. However, the mere fact of the positive caffeine result—a result definitively within the threshold for environmental contamination—is not sufficient to create a fact issue about whether Taylor or the Windhams intentionally administered caffeine or allowed it to be administered, let alone that they did so with the sole and improper motive of injuring the Simons.[10] *See Fikes*, 81 P.3d at 552; *id.* (noting that plaintiff must make "a strong showing . . . that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite" (quoting *Anderson*, 637 P.2d at 840)). Thus, we affirm the district court's order granting summary judgment to Taylor and the Windhams on the intentional-interference claim.

### C. Fraud and Prima Facie Tort

Last, the Simons purport to challenge the district court's rulings rejecting their claims for fraud and prima facie tort. But we affirm because the Simons fail to

---

[10] In suggesting that the environmental-contamination evidence isn't sufficient to support summary judgment for the defendants, the dissent relies on arguments the Simons made below but do not make on appeal. First, the Simons never fault the district court for relying on the environmental-contamination evidence in connection with this claim. Nor do they cite the regulation—N.M. Code § 15.2.6.11—that the dissent relies on. And most critically, the Simons don't argue that they created a genuine issue of material fact based on (1) testimony from the veterinarian who obtained the blood and urine samples and (2) the fact that other horses tested negative. Such arguments appear in their reply brief, but we typically decline to consider such late-blooming arguments. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (applying "general rule . . . that a party waives issues and arguments raised for the first time in a reply brief" (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009))). Instead, the Simons' *only* argument on appeal is that the positive caffeine result is sufficient to withstand summary judgment. For the reasons explained in the text, that argument fails. And indeed, the dissent doesn't suggest otherwise; instead, it goes beyond the argument in the Simons' opening brief to find a genuine issue of material fact on this claim.

19

adequately brief their challenges.

Fraud is "a misrepresentation of fact, known by the maker to be untrue, made with the intent to deceive and to induce the other party to act upon it, and upon which the other party relies to his detriment." *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 820 P.2d 1323, 1328 (N.M. 1991). Here, the district court acknowledged that the decision to enter Stolis Winner in the race "amounted to [a] representation that Stolis Winner was not administered caffeine." App. vol. 7, 2022. But the district court ruled that the Simons' only evidence—again, the positive caffeine test—wasn't enough "for a reasonable jury to conclude that [Taylor or the Windhams] knew that Stolis Winner had ingested caffeine and, consequently, knowingly made a false misrepresentation." *Id.*

On appeal, the plaintiffs present a single, two-sentence paragraph purporting to challenge this ruling. But because nothing in these two sentences "explain[s] to us why the district court's decision was wrong," we conclude that the Simons waived any challenge to the district court's fraud ruling. *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring appellant's brief to include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

For similar reasons, we decline to consider the Simons' challenge to the district court's ruling on their claim for prima facie tort. In New Mexico, prima facie tort has four elements: "(1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; [and] (4) . . . the

20

absence of sufficient justification for the injurious act." *Lexington Ins. Co. v. Rummel*, 945 P.2d 992, 995 (N.M. 1997). The Simons based their claim for prima facie tort on two factual allegations: that Taylor and the Windhams either (1) administered caffeine to Stolis Winner or (2) improperly trained Stolis Winner. In turn, the district court disposed of this claim in two parts.

First, it dismissed the claim to the extent that it was based on the intentional administration of caffeine because administering caffeine did "not constitute a 'lawful act.'" App. vol. 3, 807 (quoting *Lexington Ins. Co.*, 945 P.2d at 995). In fact, doing so was distinctly against race regulations, as the Simons argue throughout this case. The Simons purport to challenge this ruling, but they do so only in a three-sentence footnote lacking citation to authority. Thus, we also find this challenge waived.[11] *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

Second, the district court granted summary judgment to Taylor and the Windhams on the improper-training prima facie tort. It did so because a reasonable jury couldn't conclude, based solely on the positive caffeine test, that Taylor and the Windhams "intentionally but improperly trained Stolis Winner with a purpose to harm the [Simons]." App. vol. 7, 2026. The Simons fail to challenge this ruling, so

---

[11] Alternatively, we would reject this argument on its merits. The Simons baldly assert that "the act of providing caffeine to a horse alone is not an unlawful act." Aplt. Br. 31 n.10. But this statement is entirely contrary to the zero-tolerance policy for caffeine in the race regulations that the Simons rely on throughout this case.

21

we will not consider it on appeal. *See United States v. De Vaughn*, 694 F.3d 1141, 1154–55 (noting that arguments not made in opening brief are waived).

Accordingly, we affirm the district court's rulings on the claims for fraud and prima facie tort.

## Conclusion

Because the stewards' orders placing Jet Black Patriot in first place weren't final and were subject to plenary review by the Commission, the Simons lacked a protected property interest in the first-place prize money. Further, the Simons fail to establish a genuine issue of material fact on critical elements of three of their tort claims: improper motive for intentional interference with prospective economic advantage and causation for negligence per se and implied cause of action. And they waive any challenge to the district court's rejection of their claims for fraud and prima facie tort. Accordingly, we affirm.

Entered for the Court

Nancy L. Moritz
Circuit Judge

22

*Simon et al. v. Taylor et al.*, No. 17-2088
**BACHARACH**, J., concurring in part and dissenting in part.

I agree with the majority's analysis of Mr. Richard Simon and Ms. Janelle Simon's claims[1] involving denial of procedural due process, negligence per se, fraud, and commission of a prima facie tort. I also concur with the majority's affirmance of summary judgment on the Simons' claim involving an implied private right of action under a New Mexico statute and accompanying regulations. But I respectfully disagree with the majority's decision to rely alternatively on the element of causation. And unlike the majority, I believe that a genuine dispute of material fact exists on the claim of tortious interference with prospective business advantage. I would thus reverse the grant of summary judgment on this claim.

## I.    Implied Private Right of Action

The Simons claim violations of the New Mexico Horse Racing Act and the accompanying regulations. On this claim, the district court sua sponte awarded summary judgment to the defendants.[2] The majority affirms on two independent grounds:

---

[1]    Two other individuals (Mr. Eric Curtis and Mr. Jose Vega) sued, but they have not appealed.

[2]    On appeal, the Simons do not suggest prejudice from the district court's consideration of the issue sua sponte.

1.  New Mexico's statute and regulations do not create an implied private right of action. Maj. Op. at 14–15 n.7.

2.  The Simons failed to prove causation, which is required for damages under an implied private right of action. Maj. Op. at 14.

I agree with the majority that New Mexico's statute and regulations do not create an implied private right of action. I would uphold the grant of summary judgment on this ground alone. The existence of an implied private right of action is a legal question that we may consider for the first time on appeal. In contrast, causation presents a factual question requiring a determination by the district court in the first instance. *See Cox v. Glanz*, 800 F.3d 1231, 1246 n.7 (10th Cir. 2015).

New Mexico courts have not addressed the existence of an implied private right of action under state regulations. But these courts have considered the issue with respect to state statutes. In determining whether a state statute creates an implied private right of action, New Mexico courts consider three factors:

> (1) Was the statute enacted for the special benefit of a class of which the plaintiff is a member? (2) Is there any indication of legislative intent, explicit or implicit, to create or deny a private remedy? and (3) Would a private remedy either frustrate or assist the underlying purpose of the legislative scheme?

*Id.* at 1146 (quoting *Nat'l Trust for Historic Pres. v. City of Albuquerque*, 874 P.3d 798, 801 (N.M. Ct. App. 1994)). These three factors do not exclusively determine whether a statute creates an implied private right of

2

action. *See Yedidag v. Roswell Clinic Corp.*, 346 P.3d 1136, 1146 (N.M. 2015). For example, courts also consider New Mexico's public policy. *See Nat'l Trust for Historic Pres.*, 874 P.3d at 802 ("A state's public policy . . . may be determinative in deciding whether to recognize a right of action."). On balance, these factors do not support an implied private right of action under the Horse Racing Act or the accompanying regulations.

The first factor does weigh in the Simons' favor. The Horse Racing Act is designed to "ensure that horse racing in New Mexico is conducted with fairness and that the participants and patrons are protected against illegal practices." N.M. Stat. Ann. § 60-1A–5A. As participants in horse racing, the Simons are intended beneficiaries of the statute and accompanying regulations.

But the second and third factors do not suggest the existence of an implied private right of action. The Horse Racing Act establishes the New Mexico Horse Racing Commission, creates an administrative process to consider potential wrongdoing, and authorizes the Commission to impose civil penalties on wrongdoers. N.M. Stat. Ann. § 60-1A–5(C), (D); N.M. Code R. § 15.2.1.9(C)(1)(d). Because the Horse Racing Act creates mechanisms for imposing criminal and civil liability, the legislature probably did not intend to imply a private remedy for interested parties. *S & H Dev., LLC v. Parker*, No. 34-647, 2017 WL 3485065, at *5 (N.M. Ct. App. July 11, 2017) (unpublished).

Given the establishment of an administrative process with civil penalties, the legislature apparently did not contemplate a separate private right of action. *See Bergman v. United States*, 751 F.2d 314, 317 (10th Cir. 1984) ("There is no implied cause of action since Congress had already expressly created a variety of administrative and judicial remedies 'to cover the problem.'" (citation omitted)). Indeed, a private right of action could frustrate the statutory purpose by allowing inconsistent outcomes in the New Mexico Racing Commission's administrative proceedings and state-court cases. The Simons also failed to identify public policy considerations supporting an implied private right of action.

Because the Horse Racing Act and accompanying regulations do not create an implied private right of action, I would uphold the grant of summary judgment on this claim. Given the absence of an implied private right of action, we need not decide whether the Simons failed to create a triable issue on causation. *See* Maj. Op. at 14.

## II. Tortious Interference with Prospective Business Advantage

The Simons also contend that the district court erred in granting summary judgment on the claim of tortious interference with prospective business advantage. Under New Mexico law, this tort occurs when someone intentionally and improperly interferes with a prospective contractual relationship that would otherwise have been consummated. *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 841 (N.M. 1981).

4

The claim of tortious interference stems from the defendants' alleged administration of caffeine to their horse, Stolis Winner, which beat the Simons' horse. After the race, officials found caffeine in Stolis Winner's urine, which created prima facie evidence that (1) someone had administered caffeine to Stolis Winner and (2) the caffeine had been "present in the horse's body when it was participating in [the] race." N.M. Code R. § 15.2.6.9(C)(1); *see Sedillo v. N.M. Racing Comm'n*, No. A-1-CA-35658, 2018 WL 3426187, at *3 (N.M. App. 2018) (unpublished) (stating that positive test results for the presence of a prohibited substance in horses constituted "prima facie evidence that a prohibited drug [had been] administered to the horses and was present in the horses' bodies while they participated in their respective races").

The district court concluded that this prima facie evidence had not created a reasonable inference that the defendants administered the caffeine. In reaching this conclusion, the court credited the defendants' denials that they had administered caffeine to the horse. *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1248–52 (D.N.M. 2017). The district court also found that the Simons had not presented enough evidence linking the defendants to the caffeine in Stolis Winner's urine. *Id.* Finally, the district court relied on the possibility that the caffeine had come from environmental contamination. *Id.* at 1251–52.

The majority affirms, relying on the possibility of environmental contamination. Maj. Op. at 15–16 & n.8. I respectfully disagree and would reverse the summary-judgment award for three reasons.

First, the district court improperly relied on the defendants' denials. This reliance is procedurally improper because the denials came from the fact section of the defendants' summary-judgment brief, and a fact-issue existed on whether the defendants had administered caffeine to Stolis Winner.

Second, the district court improperly supported the defendants' denials by offering an alternative explanation involving environmental contamination. The defendants addressed environmental contamination only in connection with a separate claim for negligence. Even there, the defendants' argument lacked any supporting evidence. All of the scientific evidence involving environmental contamination came from the district court's own sua sponte investigation, appearing for the first time in the order granting summary judgment.

Third, even if we were to consider the fruits of the district court's sua sponte investigation, the Simons created a genuine factual dispute on the possibility of environmental contamination.

**A.** **The district court erred in granting summary judgment based on the defendants' denials that they had administered the caffeine.**

In granting summary judgment on the tortious-interference claim, the district court relied on the defendants' denials that they had administered caffeine to the horse. *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1248–52 (D.N.M. 2017). The defendants' denials appeared only in the *fact section* of their summary-judgment brief. The district court concluded that these denials had eliminated a genuine factual dispute over the defendants' roles in administering the caffeine. *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1245–46 (D.N.M. 2017). This conclusion was incorrect procedurally and substantively.

The district court erred procedurally because references in the defendants' fact section cannot substitute for argument in their brief. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (declining to consider a statement referenced in the fact section, but not in the argument section, of a summary-judgment brief); *see also Apsley v. Boeing Co.*, 691 F.3d 1184, 1201 n.15 (10th Cir. 2012) (concluding that assertions in the fact section of a brief, without legal argument, did not adequately present the issue on appeal).

The district court also erred substantively because the defendants' denials did not prevent a material factual dispute on their credibility. *See Guarino v. N.Y. State Racing & Wagering Bd.*, 845 N.Y.S.2d 858, 860

7

(N.Y. App. Div. 2007) (upholding a state agency's findings that a horse trainer had failed to rebut the presumption of liability for a trainer based on his horses' positive drug tests because the decisionmaker[3] was "entitled to assess witness credibility"). For example, the fact-finder could reasonably have disbelieved the defendants' denials because none of the evidence implicated anyone else.

Although the defendants had denied administering caffeine to Stolis Winner, the defendants presented no evidence that anyone else had both access to Stolis Winner and motive to boost the horse's performance. Who, other than the defendants, would have been close enough to Stolis Winner to surreptitiously administer the caffeine? On this question, the summary-judgment record is silent. In the absence of an answer to this question, the fact-finder could reasonably disbelieve the defendants' denials. *See Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017).

---

[3] New Mexico's regulations also make defendant Heath Taylor, the trainer for Stolis Winner, responsible for the horse from the time that it left the barn. N.M.A.C. § 15.2.6.11(B), (E)(1)–(2). Though the majority states that I am relying on this regulation (Maj. Op. at 19 n.10), I'm not. I simply note that this regulation could provide an independent source of legal responsibility for defendant Taylor. As the majority states, however, the Simons have not cited this regulation in the appeal.

8

**B. The district court erred in sua sponte investigating the facts and relying on the court's own evidence regarding environmental contamination.**

The district court relied not only on the defendants' denials but also on the possibility of environmental contamination. On this issue, the district court sua sponte conducted its own factual investigation and relied on studies that no one had presented. *See Simon v. Taylor*, 252 F. Supp. 3d 1196, 1248–52 (D.N.M. 2017) (discussing "medical and scientific reports and journals which the Court deems reliable"). For example, the district court relied on three articles about

- the presence of caffeine in equine feeds and environments and

- the amount of caffeine found in horses' blood and urine that is attributable to environmental contamination.

*Id.* at 1248–49. But in their motions for summary judgment, the defendants didn't present any of these studies. In my view, the district court should not have relied on its own investigation to grant summary judgment based on evidence that neither party had presented. *See Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order*, 702 F.3d 1279, 1296 (11th Cir. 2012) ("[W]e caution the district court to limit its analysis to facts in the record and to refrain from consulting outside

9

sources on the Internet that have not been cited, submitted, or recognized by the parties.").

The district court relied on Fed. R. Evid. 201, which authorizes judicial notice. This rule permits judicial notice of indisputable facts that are generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). "In order for a fact to be judicially noticed, indisputability is a prerequisite." *Hennessy v. Penril Datacommunications Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). Courts thus typically take judicial notice of commonplace matters like the timing of a sunrise, geographical boundaries, or matters of political history. *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

The studies cited by the district court do not satisfy the indisputability requirement of Fed. R. Evid. 201(b). And even if the studies had been indisputable, they do not involve matters of common knowledge in the district. *See Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995) (holding that the district court's acquisition of "extra-record information" was not subject to judicial notice under Fed. R. Evid. 201 because the information never reached the required level of popular familiarity). Nor could the court "readily determine[]" the correctness of these studies "from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see, e.g.*, *United States v. Carr*, 25 F.3d 1194, 1202 n.3 (3d Cir.

10

1994) (declining to take judicial notice of studies because the information was not "commonly known or readily determinable through unquestionably reliable sources").

## C.  The district court's sua sponte reliance on these studies would not have created a genuine factual dispute.

Even if the district court had properly taken judicial notice of these studies, they would not have entitled the defendants to summary judgment.

In stating that "[c]affeine and theobromine are commonly found in equine feeds and environments," the district court relied on Amit Budhraja et al., *Caffeine and Theobromine Identifications in Post-Race Urines: Threshold Levels and Regulatory Significance of Such Identifications*, 53 Proceedings of the American Association of Equine Practitioners 87 (2007). *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1248 (D. N.M. 2017). This article discussed the presence of caffeine in theobromine and theophylline, substances that are found in unexpected sources like pH test strips, bee pollen, and chocolate-covered peanuts. Budhraja, 53 Proc. of the Am. Ass'n of Equine Prac. at 92. There is *no evidence* in the summary-judgment record that Stolis Winner was given pH test strips, bee pollen, or chocolate-covered peanuts. Nonetheless, the district court cited one

sentence from this study, which noted the frequent presence of caffeine and theobromine in equine feeds and environments.[4]

The same is true of the second article cited by the district court for the possibility of environmental contamination: A.M. Dyke et al., *Detection and Determination of Theobromine and Caffeine in Urine After Administration of Chocolate-Coated Peanuts to Horses*, 22 J. of Analytical Toxicology 112 (1998). From this study, the district court concluded that the amount of caffeine in Stolis Winner's urine had approximated the amount in a horse after eating a handful of chocolate-covered peanuts. *Simon*, 252 F. Supp. 3d at 1248–49. The district court injected this scientific issue into the summary-judgment proceedings, for the defendants had not made any arguments based on the quantity of caffeine in Stolis Winner.

---

[4]     The district court also cited this article as its sole support for "tak[ing] judicial knowledge that caffeine concentrations in urine of less than 300 ng/ml are associated with environmental exposure to caffeine." *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1249–50 (D.N.M. 2017) (citing Budhraja, 53 Proc. of the Am. Ass'n of Equine Prac. 89). But the study did not express this broad conclusion about environmental exposure. The authors instead said that a finding of less than 300 ng/ml could indicate "post-collection contamination" from items like pH strips. Budhraja, 53 Proc. of the Am. Ass'n of Equine Prac. at 89. But the defendants previously stipulated that there had been no contamination during or after the collection of samples. Appellants' App'x at 216. Nor is there any summary-judgment evidence suggesting the use of pH strips to test Stolis Winner.

Even if the defendants had relied on this study, it would not have supported the grant of summary judgment. The authors of this study investigated a single incident in which a trainer attributed a positive caffeine test to ingestion of chocolate-covered peanuts. A.M. Dyke, 22 J. Anal. Toxicol. at 112–13. To investigate this incident, the authors tested three mares and concluded that chocolate-covered peanuts, which contain theobromine, could account for the amount of caffeine found in the horse. *Id.* at 115. The authors thus suggested that testers consider the ratio of theobromine to caffeine. *Id.*

There is nothing in the summary-judgment record to indicate whether the samples from Stolis Winner were tested for the ratio of theobromine to caffeine. And, of course, there is nothing to suggest that the defendants, or anyone else, fed chocolate-covered peanuts to Stolis Winner.

The district court also relied on an article by Steven Barker for the proposition that "human contamination of the equine environment is commonplace." *Simon*, 252 F. Supp. 3d at 1248. Mr. Barker did not state this broad conclusion. He simply made an "interesting observation" that caffeine is commonly found in lagoon water and in the majority of horse stalls, which "may be seen as evidence of general contamination of the equine environment by humans." S.A. Barker, *Drug Contamination of the Equine Racetrack Environment: A Preliminary Examination*, 31 J. Vet. Pharmacol. Ther. 466, 470 (2008). In the same article, Mr. Barker

acknowledged that no one currently knows how contamination of lagoon water and testing stalls might affect caffeine testing of racehorses. *Id.*

This study does not suggest contamination of Stolis Winner's lagoon water or the barn where race officials conducted the urine tests. Indeed, the State's veterinarian squarely rejected the possibility of contamination in the area where the test was administered. Appellants' App'x at 465–66.

In summary, even if we were to rely on the district court's investigation, these studies would not eliminate a factual dispute on the possibility of environmental contamination.

D.      **Even with inadequate presentation of the issue by the defendants and the district court's sua sponte reliance on scientific studies, the Simons created a genuine factual dispute on the existence of environmental contamination.**

The district court not only relied on its own factual research, but also injected the issue of environmental contamination into the consideration of the tortious-interference claim. When discussing this claim, the defendants had not even raised the possibility of environmental contamination.[5] The

---

[5]      The district court said that the Simons hadn't disputed the defendants' "factual allegation that, within the horse racing industry, levels of caffeine of 100 ng/ml in blood serum, the approximate equivalent of 300 ng/ml in urine, [are considered] environmental contamination." *Simon*, 252 F. Supp. 3d at 1250 (citing Defendants' Mot. for Summary Judgment on Negligence at 2 ¶ 10). There are two problems with the district court's statement.

14

defendants instead had relied only on (1) the absence of evidence involving loss of an actual economic relationship and (2) the inability of Stolis Winner to breed.

Even without notice of the issue, the Simons created a genuine factual dispute on environmental contamination. In their own motion for summary judgment, the Simons pointed out that under the regulations, the presence of caffeine in Stolis Winner had created prima facie evidence that the caffeine had not come from environmental contamination. N.M.A.C. § 15.2.6.9(C)(1). The Simons also noted that other racehorses, which had been exposed to the same conditions, tested negative for caffeine. Finally, the Simons relied on the State's veterinarian, who had testified that Stolis Winner was not exposed to caffeine in the barn where he was tested. In responding to the Simons' motion for summary judgment on this claim, the

---

First, the defendants did not make any legal argument involving an association between 300 ng/ml of caffeine in the urine and environmental contamination. The defendants instead urged the "industry standard," which treats caffeine levels of less than 100 ng/ml in the blood (not urine), as evidence of environmental contamination. Appellants' App'x at 1079. The Simons responded to *this* argument, pointing out that any "industry standards" are secondary to the standard adopted in this race. Appellants' App'x at 1140–41. The district court sua sponte injected the argument tying environmental contamination to less than 300 ng/ml of caffeine in a horse's urine.

Second, the summary-judgment record does not specify how many nanograms per milliliter of caffeine were found in Stolis Winner's blood. The defendants' supposed "industry standard" is thus irrelevant.

15

defendants did not present any argument, much less identify any evidence, suggesting the possibility of environmental contamination. Appellants' App'x at 1927–28.

Unlike the majority, I would not rely on evidence that the district court found while investigating beyond the record. But even if we were to consider this evidence, the general presence of caffeine in some test settings would not prove that the caffeine in Stolis Winner's urine had come from environmental contamination. A genuine issue of material fact would thus remain on the defendants' administration of the caffeine (as opposed to environmental contamination).

Given the arguments and evidence in district court, a material factual dispute existed on the defendants' administration of the caffeine. With prima facie evidence that the defendants had administered the caffeine, an absence of caffeine in other racehorses, the supporting testimony by the State's veterinarian, and a motive for the defendants to administer caffeine to Stolis Winner,[6] the factfinder could reasonably attribute the caffeine to

---

[6]     As the district court reasoned, "the positive caffeine test is some evidence of the Defendants' improper intention to interfere with the Plaintiffs' prospective [business advantage]." *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1245 (D.N.M. 2017). Like the district court, I believe that the summary-judgment record contains evidence that the defendants had intended to interfere with the Simons' prospective contractual relationships.

16

the defendants rather than credit an alternative explanation of environmental contamination. *See Dutrow v. N.Y. State Racing & Wagering Bd.*, 97 A.D.3d 1034, 1036, 949 N.Y.S.2d 241, 244 (N.Y. App. Div. 2012) (upholding a finding that a prohibited substance had been administered to a racehorse in part based on a positive drug test and rejecting the trainer's argument attributing the positive drug test to cross contamination).

E. **Evidence used to address the negligence claim does not support the grant of summary judgment on the claim of tortious interference**.

The majority reasons that the district court could properly reject the claim of tortious interference based on evidence considered in connection with the negligence claim. Maj. Op. at 17 n.8. I respectfully disagree with this reasoning. The district court used its own evidence outside the record to address the defendants' arguments on the negligence claim. The court then used that same evidence to reject the tortious-interference claim on a theory that the defendants hadn't even raised. In my view, the court erred in sua sponte injecting this issue and going outside the summary-judgment record in order to reject the tortious-interference claim.

---

In the briefing on their summary-judgment motion, the defendants did not question the evidence of improper intent. The defendants presumably declined to seek summary judgment with respect to their intent because they had an obvious financial motive to boost Stolis Winner's performance.

On the negligence claim, the defendants asserted that the caffeine might have come from environmental contamination. But the defendants did not make this assertion when addressing the claim of tortious interference.[7] The district court then performed its own research on the issue of environmental contamination and considered this evidence when rejecting both claims (negligence and tortious interference).

The majority states that the defendants' failure to argue environmental contamination on the tortious-interference claim doesn't matter because (1) the district court supplied a "background section" containing facts pertinent to both claims (negligence and tortious interference), and (2) the Simons do not challenge this blending of background facts. *Id.* I respectfully disagree.

Even though the district court recited background facts bearing on both claims, the court separately analyzed the claims of negligence and tortious interference. The court's error had nothing to do with its discussion of background facts bearing on both claims; the court's error

---

[7]    Even on the negligence claim, the defendants relied solely on two sentences without a citation or any factual support:

- Sentence 1: "Caffeine is one of the most widely-used substances in the world."

- Sentence 2: "It is present everywhere in the environment."

Appellants' App'x at 1079.

lay in using its own investigation on environmental contamination (with respect to the negligence claim) in order to award summary judgment on the tortious-interference claim. And the Simons *do* challenge the district court's reliance on that evidence of environmental contamination in connection with the tortious-interference claim. There is thus no basis for the majority to affirm based on the district court's blurring of the evidence presented on the two distinct claims (negligence and tortious interference).

F.    **In this appeal, the Simons have properly raised arguments of a material factual dispute by challenging the defendants' failure to prove environmental contamination.**

The majority states that the Simons have not raised any of these arguments. *See* Maj. Op. at 17 n.8; 19 n.10.[8] I respectfully disagree.

In their opening brief, the Simons challenged the district court's reliance on the defendants' "self-serving declarations that they did not administer the drug alongside evidence of the general possibility of environmental contamination (without any specific evidence related to contamination at this Race)." Appellants' Opening Br. at 44. The

_____

[8]    The majority states that

- "the Simons do not advance [these arguments] on appeal" (Maj. Op. at 17 n.8) and

- the Simons raise these arguments for the first time in their reply brief (Maj. Op. at 19 n.10).

I respectfully disagree with both statements, as discussed in the text.

defendants responded that "[the Simons] have never provided evidence to refute or call into question defendant's evidence that positive tests were the result of environmental contamination." Appellees' Resp. Br. at 25. In their reply brief, the Simons addressed the defendants' response, arguing that (1) there was no credible evidence of environmental contamination, (2) the State's veterinarian had confirmed the absence of contamination, and (3) the only contrary evidence consisted of the defendants' self-serving denials of involvement:

> The only evidence produced by the Private Defendants was self-serving declarations that they did not administer the drug and evidence regarding the general possibility of environmental contamination (assertions made without any specific evidence made with respect to contamination at this Race). There was no credible evidence and only speculation that any contamination occurred, so the contamination "evidence" is insufficient to conclusively negate the Private Defendants' administered the drug. Quite to the contrary, the State's own veterinarian, Dr. Unruh, who was responsible for overseeing the testing barn and was present the whole of time Stolis Winner was in the testing barn, affirmed that nothing contaminated the horse or samples. *See* Aplt. App. 1640–41 29:16–25; 32:25–33. (This is the kind of evidence the state made sure was not admitted during the state administrative proceeding that Plaintiffs were shut out of). No other evidence other than Defendants' speculation has been presented that would indicate any contamination occurred in the test barn. *See* Aplt. App. 1514, 29:17–21. Without the contamination evidence, the Private Defendants were left with their self-serving declarations that they did not administer caffeine to Stolis Winner.

Appellants' Reply Br. at 17.

The majority recognizes that the Simons presented all of these arguments in their reply brief. Maj. Op. at 19 n.10. But the majority calls

20

these "late-blooming arguments" omitted from the Simons' opening brief. Maj. Op. at 19 n.10. These are not new appellate arguments; they are direct rejoinders to the defendants' argument that the Simons had failed to dispute the evidence of environmental contamination.

* * *

In summary, I would conclude that a genuine dispute exists on whether the defendants administered caffeine to Stolis Winner. Unlike the district court and the majority, I do not believe that this genuine dispute of material fact can be resolved by (1) the defendants' denials that they had administered the caffeine or (2) the possibility of environmental contamination. And the district court should not have (1) engaged in its own sua sponte investigation regarding the possibility of environmental contamination or (2) used extra-record evidence on an issue involving the negligence claim to reject an entirely distinct claim. I would thus reverse the district court's grant of summary judgment on the Simons' claim of tortious interference with prospective business advantage.

## III. Conclusion

I agree with the majority's analysis of the claims involving denial of procedural due process, negligence per se, fraud, and commission of a prima facie tort. And, like the majority, I would affirm the award of summary judgment to the defendants on the claim involving an implied private right of action under the New Mexico statute and accompanying

21

regulations. But I respectfully disagree with the majority on the claim involving tortious interference with prospective business advantage. In my view, the district court and the majority have improperly resolved a fact issue more properly suited for the factfinder.